UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

"IN ADMIRALTY"

CASE NO. 1:20-cv-25046-KMW

GREAT LAKES INSURANCE SE,

   Plaintiff,

v.

CHARTERED YACHTS MIAMI LLC,

Defendant.
_____/

## DEFENDANT CHARTERED YACHTS MIAMI LLC RESPONSE TO PLAINTIFF GREAT LAKES INSURANCE SE MOTION FOR SUMMARY JUDGMENT

Defendant CHARTERED YACHTS MIAMI LLC ("CYM"), by and through its undersigned counsel, hereby files this Response to Plaintiff GREAT LAKES INSURANCE SE ("GLI") Motion for Summary Judgment, and states:

### LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Genuine disputes of fact exist when the evidence is such that a reasonable jury could render a verdict for the non-movant. Factual issues are considered genuine when they have a real basis in the record." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016).

1

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings," but instead must present "specific facts showing that there is a genuine issue for trial." *Walker v. Darby*, 911 F.2d 1573, 1576–77 (11th Cir. 1990). In deciding a summary judgment motion, the Court must not make witness credibility determinations, weigh the evidence or draw legitimate inferences from the facts as that is the function of the jury, "not those of a judge". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also United States v. Davis*, 809 F.2d 1509, 1513 (11th Cir. 1987). Finally, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor". *Anderson,* 477 U.S. at 255. Finally, Courts must allow "otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form". *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

1. Defendant Charter Yachts Miami LLC is the record owner of the M/Y PETRUS ("Vessel"), which was insured by Plaintiff Great Lakes Insurance SE ("GLI") from March 8, 2020 to March 8, 2021. [DE 12].

2. Plaintiff commenced this action against the Defendant CYM for declaratory judgment arising out of a claim for coverage that CYM made as a result of a loss the Vessel suffered

        on November 7, 2020 ("incident") where the Vessel took on water and sunk on the Miami River. [DE 1]

3. During the incident, the weather was very bad as it was the day before a hurricane approached Miami and so the water was very choppy and rough during the entire incident. Additionally, it was raining hard, and it was windy enough to rock the boat as Vessel was making its way down the Miami River. **Exhibit B** at p. 65: 2-17.

4. Plaintiff GLI claimed that coverage was denied because the loss was not caused by a fortuitous or accidental physical loss event. [DE 65]

5. During normal operations, the Vessel's swim platform at all times is above the water and the transom door is not subjected to water intrusion from water coming over the swim platform. *See* **Exhibit H**; **Exhibit I**[1].

6. The Incident occurred on the Miami River, which is a No Wake Zone, which meant that at the time of the incident, the Vessel was travelling at slow rate of speed. *See* **Exhibit A**, at p. 14: 9-12. Regardless, at both a low speed and at maximum speed, the Vessel's swim platform is always above the water and so water would not have come over the swim platform. *See* **Exhibit H**; **Exhibit I**.

7. Under the swim platform but above the waterline, the Vessel has a rectangular compartment which contains a ladder ("swim platform ladder") that allows guests to climb up onto the swim platform from the water. *See* **Exhibit D**.

8. CYM's investigation into the loss concluded that the loss was caused by a rope or line that at some point in time got entangled on the Vessel's port propeller as the Vessel entered the

---

[1] All exhibits referenced are attached to the Defendant's Response to Plaintiff GLI's Statement of Material Facts.

        Miami River on the date of the incident. *See* **Exhibit C**, at PackCYM000480 - PackCYM000481; *see also* **Exhibit D**; *see also* **Exhibit E**.

9. This line which became wrapped around the port propeller and ultimately caused the port engine to shut down. Unbeknownst to those onboard, the Yacht, was dragging an underwater object attached to the other end of the line. As the Vessel struggled to go forward, the stern of the Vessel was pulled lower into the water which in turn initially submerged the swim ladder compartment, and later the swim platform. *See* **Exhibit C**.

10. Under normal operations, the swim platform, with its swim platform ladder compartment, is above the water. But due to the fact that the line or rope which was also wrapped around the Vessel's port propeller, initially the swim ladder compartment was dragged underwater. *See* **Exhibit C**.

11. As the stern was dragged and lowered into the water, this caused the swim ladder compartment to be submerged underwater which flooded through that compartment and into the garage bilge as they are connected internally. *See* **Exhibit C** ("the garage and engine room bilges are in fact one bilge; therefore, any water entering through the swim platform swim ladder door, will fill the container holding the ladder, which is not watertight and then flow into the garage bilge").

12. John Stoddard ("Stoddard"), a friend of Pack assisted the TowBoats salvors with their diving operations on the night of November 7, 2020 and while he was diving underwater, he personally saw that a line was in fact wrapped around the port propeller that led out into the middle of the Miami River. *See* **Exhibit E**.

13. After the Vessel was towed to Merrill-Stevens and lifted out of the water, Stoddard took a photograph of that same frayed line attached to the port propeller, attached as Exhibit D.

*Id.*; *see also* **Exhibit D**.

14. Plaintiff GLI denied coverage because the Vessel was "unseaworthy and/or the damage was due to wear and tear and a lack of maintenance".

15. In GLI's opinion, the Vessel did not have a watertight transom door, a functional bilge pump, any distress signals, two life rafts or an EPIRB device. [DE 69].

16. Plaintiff GLI also claimed that coverage was denied because CYM allegedly misrepresented material facts regarding following and completing the recommendations set forth in Lou Gonzales's Global International Marine Surveyors survey ("Global Survey"). [DE 65].

17. In Neil MacLaren's ("MacLaren") Expert opinion for CYM, the incident was caused by the line attached to the port propeller, not lack of maintenance or unseaworthiness. **Exhibit C**.

18. Furthermore, Joshua Montpellier ("Montpellier") testified that he closed the transom door before departing on the bareboat charter and thus would not have contributed to the loss. *See* **Exhibit F**, at p. 15: 4-16.

19. Additionally, Pack testified that he never operates the Vessel with the transom door open and knew the transom door was closed during the entire bareboat charter because it would have obstructed his vision on the back of the Vessel and he would have seen the large LED letters on the transom door. **Exhibit B** at p. 67: 2-25; 68: 1-15; *see also* **Exhibit G**.

20. Finally, MacLaren opined that as the crew testified the transom door was closed during the bareboat charter, the only way it would have opened to let water enter the Vessel was caused by a "short circuit" of the door's controls when water filled the garage when it entered through the swim platform ladder door. **Exhibit C**, at PackCYM000480.

21. The transom door of the Vessel was properly sealed and was properly maintained on the day of the incident. GLI's surveyor, Michael Grant ("Grant") only viewed the Vessel after the sinking had occurred and so he only saw the damage the TowBoats USA ("TowBoats") salvors caused to the Vessel's transom door rather than its condition on the day of the incident. During the salvage operations, the transom door was heavily damaged by TowBoats as it was forcibly disconnected from the rams and forced shut by the salvors with hammers. Furthermore, TowBoats damaged the transom door during the tow operations to bring the Vessel to Merrill-Stevens shipyard ("Merrill-Stevens") when they pulled apart the door seal and ripped off the railings when a tow line became snagged on the transom door. **Exhibit B**, at p. 80: 1-25.

22. The Vessel has bilge pumps as required by 46 CFR §56.50-55 and all were fully operational on November 7, 2020. *See* **Exhibit B,** at p. 57: 9-25; p. 58: 1-8; *see also* **Exhibit C**.

23. The mechanic bilge pump in question ("aft bilge pump") was fully operational on the day of the incident and had been inspected and fully serviced by CK Dockside a month before the incident. *Id.*, at p. 55: 1-24.

24. Additionally, on the morning of the day of the incident, Pack personally checked that the aft bilge pump was operating and that the bilges were dry when he went into the garage room to start the Vessel's generators. *Id.*, at p. 57: 9-25; p. 58: 1-8.

25. Furthermore, MacLaren personally inspected the Vessel on August 19, 2021 and he found that the aft bilge pump was only inoperable because the wire for the pump's float switch had a **"clean and bright"** cut which indicated that the damage was new and thus the pumps inoperability "cannot be attributed to the pump being deteriorated or in a non-working

6

|   |   |
|---|---|
|   | condition as a result of a lack of maintenance". **Exhibit C**, at PackCYM000479 - PackCYM000480. [Bold added]. |
| 26. | All of the recommendations in Lou Gonzales's Global International Marine Surveyors survey ("Global Survey") were completed as required. Pack testified that he purchased distress flairs and that the Vessel had distress flairs in four different locations, on the helm, under the stairs, captain's quarters and underneath the lay out pads in the stern, however Grant never requested to see the flairs. **Exhibit B**, p. 45: 1-9. |
| 27. | Grant never requested to see the distress flairs during his survey and so he claimed he never "sighted" the flairs as he never requested to see where they were stored. *Id.*, p. 45: 1-9 |
| 28. | Pack also had all of the life rafts recertified as required, however one of the life rafts floated away during the sinking incident and so by the time Grant surveyed the Vessel, it only had one life raft as a result of the sinking. *Id.*, p. 46: 2-15; p. 49: 2-24. |
| 29. | The Vessel also had new EPIRB's, however it too floated away during the sinking as it was inside of a bag with the life vests, which were all lost during the sinking. *Id.*, p. 50: 9-24. |
| 30. | Pack testified that he took purchased new EPIRBs, distress signals and had the life rafts recertified as required. *Id.*, p. 45: 1-9; p. 46: 2-15; p. 49: 2-24; p. 50: 9-24. |
| 31. | The Vessel was also properly maintained and regularly serviced by Craig Koblitz ("Koblitz") of CK Dockside. *See* **Exhibit L**. |
| 32. | For example, on July 8, 2020, Koblitz removed the swim ladder, repaired its cable roller and then reinstalled the hydraulic valves and sealed the ladder door. *Id.* |

33. Koblitz conducted other relevant maintenance tasks such as on August 6 and 7, 2020, he worked to troubleshoot the aft bilge pump, the pump at issue in this lawsuit and repaired the wiring alarm on the aft bilge pump. *Id.*, at PackCYM000484.

34. And again, the pump underwent regular maintenance on October 11 through the 18, 2020 when Koblitz disassembled the pump to clean out its parts. *Id.*, at PackCYM000490.

35. Finally, Plaintiff GLI claimed that the US Coast Guard requires bareboat charter operators to hold a valid USCG Captain's License and thus denied coverage as they claim that Greg Pack ("Pack") violated that purported requirement.

36. The Vessel at the time of the incident was operating under a Bareboat Charter Agreement wherein CYM relinquished ownership, control and possession of the Vessel for the time of the bareboat charter. *See* **Exhibit J**.

37. The US Coast Guard ("USCG") does not require the operator of a bareboat charter to be licensed. *See* **Exhibit F**, at p. 11: 6-14; p. 12: 8-12; p. 21: 3-17; *see also* **Exhibit K**, at p. 44: 6-17.

38. Additionally, the crew members that the Bareboat Charterer selected, namely Joshua Montpellier and Sufi Chang, were paid directly by the Bareboat Charterer as is required by a bareboat charter agreement as the crew is selected and fully controlled and paid for by the bareboat charterer. **Exhibit F**, at p. 10: 2-8; *see also* **Exhibit K**, at p. 14: 6-22.

39. Concept Special Risks Ltd ("Concept") as the authorized underwriting and claims handling agent for GLI, provided Pack with an application form when Pack applied for a policy with GLI. [DE 65-1].

40. On the second page of the application, the form has two contradictory, ambiguous and confusing questions regarding the proposed use of the Vessel. [DE 65-1].

41. Question two asks "is this Vessel chartered to others with a captain", to which Pack answered "Yes" because GLI's insurance policy is a "Named Operator" policy, meaning that only a person that is named and approved as an insured operator can operate the Vessel and so in order for CYM to be compliant with the policy, they had to have the Vessel chartered to others with a captain who was on the policy's named operator list. *See* **Exhibit K**, at p. 38: 6-21; p. 39: 15-25; p. 41: 1-8.

42. Furthermore, the policy application asks on question 4 if "is this Vessel chartered to others without a captain (bareboat)?" and CYM was required by the policy to select "No", because the policy requires the Vessel to be operated by a named operator captain at all times. *See* **Exhibit K**, at p. 40: 12-25; p. 41: 1-8.

43. CYM provided prospective bareboat charterers with a list of named operators [and therefore pre-approved] captains that were preapproved by the insurance company in order to comply with both USCG and GLI's requirements. *See* **Exhibit K**, at p. 42: 1-16; p. 44: 14-17.

44. On the day of the incident, the pre-approved operator onboard during the bareboat charter was Greg Pack. *See* **Exhibit F**, at p. 9: 12-14.

## ARGUMENT

**A. The Vessel was not Unseaworthy and was properly maintained by the Assured CYM**

While implied warranties of seaworthiness do attach to the policy, the presumption that the Vessel was inherently unseaworthy does not. As GLI admits, this presumption only applies when the seas are calm but as the unrebutted facts show, the seas were not calm on the day of the incident. As Pack testified, the seas were very rough and "choppy", it was raining "pretty heavy"

while the Vessel was navigating into the Miami River, to such an extent that the Vessel itself was "bouncing" while on the Miami River. **Exhibit B** at p. 65: 1-17.

As Defendant CYM's Vessel sank in rough seas, the presumption does not apply and so the only evidence that the Defendants need to show is that the loss was covered under the terms of the policy, such as for the loss being caused by an accidental external event or by a fortuitous nature, as will be shown below.

However, even if the Court finds that the presumption applies, it may be rebutted by a showing that the

> vessel left port in a seaworthy condition, "a counter presumption arises that the unexplained sinking and consequent loss was caused by some extraordinary, although unknown and unascertainable, peril of the sea." In these circumstances, then, the insurer bears the ultimate burden of proving unseaworthiness.

*Insurance Co. of North America v. Lanasa Shrimp Co.*, 726 F.2d 688, 690 (11th Cir.1984).

CYM has clearly shown that the Vessel left port in a seaworthy condition. The day before the incident, Pack ensured that the bilge pump was functioning as he cleaned out the sea strainers and had to use the bilge to pump water out of the Vessel. *Id.*, at p. 55: 1-24. Furthermore, on the day of the incident, Pack checked the engine room in the morning to ensure the safe operation of the Vessel. Pack started the generators and went through a series of safety and operational checks such as "checking on the main engines, the transmissions. The bilge is open. You can see it right there. The transmissions. You check the bilges, make sure there is no water. Visual at the sea strainers. We checked the A/C panel board to make sure that everything on the A/C is operating properly". **Exhibit B** at p. 58: 1-8.

The aft bilge pump, it was inspected and fully serviced by Koblitz from CK Dockside a month before the incident. *Id.*, at p. 55: 1-24. 32. This testimony is supported by Koblitz's records where it shows the aft bilge pump underwent regular maintenance on October 11, 2020 through

10

the 18, 2020 when Koblitz disassembled the pump to clean out its parts. *Id.*, at PackCYM000490. Further repairs were conducted just a few months before the incident on August 6, 2020, where Koblitz troubleshot and repaired the aft bilge pump, the pump at issue in this lawsuit and repaired its wiring alarm. *Id.*, at PackCYM000484. At all relevant times during the course of the policy and on the date of the incident, the aft bilge pump was functioning properly, and it had been well maintained and any repairs that were required, were conducted in an expedient manner by Koblitz, on behalf of CYM.

Furthermore, CYM's Expert Witness, Neil MacLaren personally inspected the Vessel on August 19, 2021 and he found that the aft bilge pump was only inoperable because the wire for the pump's float switch had a "clean and bright" cut which indicated that the damage was new and thus the pumps inoperability "cannot be attributed to the pump being deteriorated or in a non-working condition as a result of a lack of maintenance". **Exhibit C**, at PackCYM000479 - PackCYM000480. The fact that the cut was new meant that the pump itself was fully functioning during the incident and so the Vessel was seaworthy.

As to the transom door, it was fully closed during the incident as both Pack and Montpellier testified. Montpellier testified that he closed the transom door before departing on the bareboat charter and thus would not have contributed to the loss. *See* **Exhibit F**, at p. 15: 4-16. Pack testified that he never operates the Vessel with the transom door open and he knew the transom door was closed during the entire bareboat charter because it would have obstructed his vision on the back of the Vessel and he would have seen the large LED letters on the transom door. **Exhibit B,** at p. 67: 2-25; 68: 1-15; *see also* **Exhibit G**. As you can clearly see in the photographs of the Vessel, the transom door's large LED lettering would have blocked Pack's rear view and so if the door was open, he would have immediately noticed. MacLaren also opined that as the crew testified the

11

transom door was closed during the bareboat charter, the only way it could have opened later in the voyage would have been due to a "short circuit" of the door's controls. This arguably would have allowed water to fill the garage after water initially flooded in through the swim platform ladder door. **Exhibit C**, at PackCYM000480.

The transom door's seal was in proper condition during the incident as well. GLI's surveyor, Grant, only viewed the Vessel after the sinking had occurred and so he only saw the damage that TowBoats had caused to the Vessel's transom door and its seal rather than viewing the door and seal in the condition it was in earlier in the day of the incident. During the salvage operations, the transom door was heavily damaged by TowBoats as it was forcibly disconnected from the rams and forced shut by the salvors with hammers. Furthermore, TowBoats damaged the transom door during the tow operations which brought the Vessel to Merrill-Stevens when TowBoats pulled apart the door seal and ripped off the railings. This occurred when a tow line became snagged on the transom door. **Exhibit B**, at p. 80: 1-25.

The conditions of the sea during the sinking were very rough, with high winds, heavy rain and seas choppy enough to rock and bounce the Vessel and so the alleged presumption that the Vessel was unseaworthy does not apply. Even if the presumption applies, CYM has shown that the Vessel was fully seaworthy at the time that it left port and so it is now presumed that the loss was caused by a peril of the sea or through a fortuitous or accidental external event, in which case the burden shifts to GLI to show the Vessel was unseaworthy. *Insurance Co. of North America v. Lanasa Shrimp Co.*, 726 F.2d at 690. In any event, this Court is not required to conclusively determine whether or not the Vessel's pump or transom door were inoperable during the incident as the Court cannot "make witness credibility determinations, weigh the evidence or draw legitimate inferences from the facts" at this stage on GLI's Motion for Summary Judgment. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). CYM has satisfied the burden of showing a "genuine issue for trial" based on the above facts and testimony and thus GLI's Motion for Summary Judgment must be denied. *Walker v. Darby*, 911 F.2d at 1576–77.

### B. The Vessel was not Unseaworthy and CYM did not Breach the Express Warranty

As stated above, the Vessel was not unseaworthy and so the policy's express warranty was not violated. The bilge pump and the transom door were properly functioning and well maintained on the date of the incident and throughout the course of the policy until the Vessel suffered the sinking, wherein the bilge pump wiring was cut and the transom door was badly damaged by the TowBoats salvors in an effort to rescue the Vessel as further described above. *See* **Exhibit B**, at p. 80: 1-25; **Exhibit C**, at PackCYM000479 - PackCYM000480. Therefore, the express warranty was not violated and GLI's motion must be denied as there is a genuine issue for trial to determine the factual disputes between the parties.

### C. CYM did not Misrepresent Material Facts

The Eleventh Circuit has plainly rejected the bright-line rules of other circuits and instead demands a "more fact-specific approach" in determining materiality. *Great Lakes Ins. Se v. Sea 21-21 LLC*, No. 20-22865-CIV-ALTONAGA/Torres, 2021 U.S. Dist. LEXIS 248686, at *13 (S.D. Fla. Oct. 18, 2021) (citing *Great Lakes Reinsurance (UK) PLC v. Roca*, No. 07-23322-CIV, 2009 U.S. Dist. LEXIS 5423 (S.D. Fla. Jan. 27, 2009)). While GLI cites to *Great Lakes Reinsurance (UK) PLC v. Atlantic Yacht & Marine Services, Inc.*, 2008 A.M.C. 1041 (S.D. Fla. 2008) for the proposition that there is a bright-line rule that establishes a presumption of materiality when the insurance requests specific information, that rule is no longer followed as mentioned above. *Id.* Furthermore, in the Eleventh Circuit, Courts will not accept "the insurer's after-the-fact,

conclusory statements claiming a certain fact is material and would have affected its decision to insure an applicant". *Sea 21-21 LLC*, No. 20-22865-CIV-ALTONAGA/Torres, 2021 U.S. Dist. LEXIS 248686, at *15. In this case, GLI has attached an affidavit from Mr. Beric Usher, Concept's senior underwriter which is simply a self-serving "after the fact" statement that must be rejected, just as the Court did in *Sea 21-21 LLC* and *Roca*. *See Sea 21-21 LLC*, No. 20-22865-CIV-ALTONAGA/Torres, 2021 U.S. Dist. LEXIS 248686, at *15; *see also Roca*, No. 07-23322-CIV, 2009 U.S. Dist. LEXIS 5423, at *6.

GLI failed to provide any other evidence regarding Mr. Pack's licenses and whether they were up to date. In any event, none of the alleged deficiencies have anything to do with whether or not the status of Mr. Pack's licenses was material to granting the insurance policy. The facts themselves in this case do not support that CYM made a misrepresentation or that the misrepresentation was material. Pack testified that he did in fact have a 200-ton captain's license and was fully trained and certified in captaining and driving yachts, however he let the licenses "lapse" some years ago. **Exhibit B** at p. 17: 2-25. Additionally, Pack testified and disclosed that he had a current and active Florida's boating license, that he attended sea school in Florida and re-took and passed all boating exams and received a certification for completing a US Coast Guard approved course. *Id; see also* **Exhibit M –** Pack Sea School Certification. There is no issue as to whether or not Pack was qualified and trained to captain a yacht, such as the Vessel in question. The only reason why GLI asks whether the operators are licensed is to determine whether they are trained and qualified in operating a Vessel. Pack was trained and qualified as mentioned and even held an active certificate as mentioned and so there is no extra risk in having Pack as a named operator as he is well qualified to operate Vessels. Moreover, GLI has introduced no evidence to link up the casualty to a lack of seamanship.

Furthermore, "reasonable minds could" differ as to the materiality of the question on the application regarding licensing because as mentioned, the Coast Guard does not require those operating a Vessel on a bareboat charter to have an active USCG license. And in fact, some recommended against obtaining a license due to the Coast Guard regulations. *See* **Exhibit F**, at p. 11: 6-14; p. 12: 8-12; p. 21: 3-17; *see also* **Exhibit K**, at p. 44: 6-17; p. 66: 7-25; p. 67: 1-12. The Vessel was clearly under a Bareboat Charter at the time of the incident and so there was no legal requirement for Pack to be licensed and so there is no additional risk to GLI in insuring the Vessel and having Pack as a named operator as all laws are being complied with. *See* **Exhibit J**.

As to the claim of misrepresentation, Pack did not misrepresent his training and certification as he did have a 200-ton license, however it had lapsed in the past and was not renewed. **Exhibit B** at p. 17: 2-25. GLI would like this Court to infer that the mistake that Pack made on the application was done on purpose, however that would be improper as the "Court must view the proffered evidence and all factual inferences arising from it in the light most favorable to" CYM. *Sea 21-21 Llc*, No. 20-22865-CIV-ALTONAGA/Torres, 2021 U.S. Dist. LEXIS 248686, at *21. CYM argues the inference to be drawn from the fact that Pack listed an out-of-date license is that he was attempting to be as truthful as possible in listing his relevant licenses for GLI, being the lapsed 200-ton license. In either case, GLI has failed to provide any evidence that would be sufficient to "raise a genuine dispute of material fact" as to the inferences and intentions for the alleged misrepresentation and so the Court must deny GLI's motion to allow these factual disputes to be properly resolved at trial. *Id.*

### D. CYM did not Breach the Legal and Regulatory Compliance Warranty

CYM has both shown a genuine dispute of material fact that it did not breach the Legal and Regulatory Compliance warranty and thoroughly shown that it did not in fact misrepresent the

compliance with the Global Survey recommendations. *Id.* As GLI admits, the issue is simple and that is to ask whether these survey recommendations were completed. And as the testimony and evidence shows, they were completed, or at least there is a genuine dispute as to the material fact of if these recommendations were completed. The most important fact here is that the only evidence GLI has put forth to argue that the recommendations were not followed was Grant's survey that took place after the sinking incident occurred. As Pack testified, he purchased distress flairs for the Vessel that were kept in four different locations, on the helm, under the stairs, captains' quarters and underneath the lay out pads in the stern, however Grant, GLI's surveyor, never requested to see those flairs. **Exhibit B**, p. 45: 1-9. Pack also had all of the life rafts recertified and the Vessel did in fact have 2 life rafts on the day of the incident, however as a result of the sinking, of the life rafts floated away and so by the time Grant surveyed the Vessel after the incident, it only had one life raft. *Id.*, p. 46: 2-15; p. 49: 2-24. Pack also purchased new EPIRBs, however those were lost during the sinking as the EPIRBs were inside of a bag with the life vests, which all floated away in the Miami River when the Vessel sank. *Id.*, at p. 45: 1-9; p. 46: 2-15; p. 49: 2-24; p. 50: 9-24. GLI to date, has not produced any evidence to show that the Vessel did not have 2 life rafts, EPIRBs or distress flairs on the date of the incident and thus the Motion must be denied as a genuine issue of material fact still remains.

### E. CYM did not Breach the Letter of Compliance Warranty

CYM has complied with all laws and regulations governing the use of the Vessel. As mentioned above, the Vessel did have an EPIRB, two life rafts and all of the safety/distress flairs and signals onboard. The only issue was that when Grant conducted his survey, the EPIRB and one life raft had floated away as the Vessel had sunk on the Miami River. *Id.*, at p. 45: 1-9; p. 46: 2-15; p. 49: 2-24; p. 50: 9-24. Furthermore, Grant never requested to see all of the distress flairs

aboard the Vessel during his survey and so he never saw those flairs that did exist on the Vessel. *Id.*, at p. 45: 1-9. The issue of the flairs or lack of flairs is immaterial to the issues before this Court. CYM should not be faulted for GLI's incomplete and haphazard investigation. Finally, as mentioned, none of the Coast Guard's regulations require a bareboat charter operator to be licensed, and in fact, they recommend against having a license due to those same regulations. CYM and Pack could not have been in violation of Coast Guard regulations when those regulations do not require a captain to have a license on a bareboat charter. *See* **Exhibit F**, at p. 11: 6-14; p. 12: 8-12; p. 21: 3-17; *see also* **Exhibit K**, at p. 44: 6-17; p. 66: 7-25; p. 67: 1-12. Furthermore, CYM has met its burden and shown that at the very least, a genuine dispute of material fact exists based on the record evidence and thus GLI's motion must be denied.

**F. The Loss was Caused by an Accidental External Event, which is Covered Under the Policy**

Finally, GLI alleges that the incident occurred because the Vessel's stern normally sits low in the water while in navigation, which normally allows water to come over the swim platform and up to the transom door and because on the day of the incident, the Vessel was allegedly unseaworthy because transom door was allegedly open and the bilge pump was inoperable, the Vessel flooded and then sank. However even a cursory glance at the evidence shows that all of these allegations are unproven. The evidence shows genuine dispute of material fact as to each of GLI's theories on how the Vessel sank. It is undisputed that the Vessel sank on the Miami River and CYM has presented multiple pieces of evidence, including a photograph of the Vessel navigating on the Miami River under normal operations, as well as a photograph of the Vessel at full speed on Biscayne Bay. *See* **Exhibit H**; **Exhibit I**. It is clear that the Vessel's stern and swim platform are **not** normally low in the water and that water **does not** come over the swim platform,

17

even when the Vessel is at full speed and creating a massive wake. Even with a lot of weight on the back of the Vessel, the swim platform does not get lowered into the water to allow water to flood over the swim platform. *See* **Exhibit B**, at p. 62: 1-25. CYM's investigation later revealed that the true cause of the sinking was because an underwater rope attached to a heavy object in the Miami River got caught on the Vessel's port propeller, which then dragged the stern down, which allowed water intrusion through the swim ladder compartment. *See* **Exhibit C**, at PackCYM000480 - PackCYM000481; *see also* **Exhibit D**. The forces from the rope that was attached to a heavy underwater object dragged the Vessel's stern underwater, which allowed water began to enter the Vessel through the swim platform ladder door, which is located under the Vessel's swim platform. *See* **Exhibit D**. The container holding the swim platform ladder is not designed to be watertight and when it was dragged under the water, water entered through it and flowed into the garage bilge, thus leading to the eventual sinking of the Vessel. **Exhibit C**, at PackCYM000480.

Third party witness John Stoddard also testified that he personally witnessed the underwater rope wrapped around the port propeller on the day of the incident as he was diving underwater to assist the TowBoats salvors in putting airbags under the Vessel. *See* **Exhibit E**. He then later photographed that same rope still attached to the port propeller when the Vessel was hauled out at Merrill-Stevens shipyard. *See* **Exhibit D**. Further evidence that the rope causing the sinking was that during the incident, the port engine "abruptly stopped" or shutdown at the time without explanation. *See* **Exhibit B**, p. 69: 1-25. While at the time Pack thought the port engine had shut off because of water intrusion, it was later discovered that the engine shut off as a result of the rope becoming ensnared in the port propeller.

## CONCLUSION

CYM has provided sufficient evidence to show a genuine issue of material fact as to each of GLI's allegations, such as the Vessel was not unseaworthy as the Vessel was properly maintained, the pumps and transom door were fully operational and that CYM never made any material misrepresentations or violated any Coast Guard regulations for bareboat charters. Therefore, GLI's Motion for Summary Judgment must be denied.

WHEREFORE, the Defendant Chartered Yachts Miami LLC, respectfully requests this Court deny Plaintiff Great Lakes Insurance SE's Motion for Summary Judgment.

Dated: May 9, 2022                                        Respectfully submitted,

**MOORE & COMPANY, P.A.**
*Attorneys for Defendant/Counter-Plaintiff*
255 Aragon Avenue, 3rd Floor
Coral Gables, Florida 33134
Telephone:(786)221-0600
Facsimile: (786)221-0601
Email: michael@moore-and-co.com
Email: kvartak@moore-and-co.com

s/ Kavan Vartak
Kavan Vartak, Esq.
Florida Bar No. 1017058
Michael T. Moore, Esq.
Florida Bar No. 207845

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2022, I electronically filed the foregoing document with the Clerk of the court using CM/ECF. Copies of this pleading will be automatically served on all counsel of record through the Court's CM/ECF system.

s/ Kavan Vartak
Kavan Vartak, Esq.
Florida Bar No. 1017058