## Page 1

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2                 IN ADMIRALTY
              CASE NO:  20-cv-25046-KMW
 3

 4    GREAT LAKES INSURANCE SE,

 5         Plaintiff,

 6    vs.

 7    CHARTERED YACHTS MIAMI LLC,

 8         Defendant.

 9    _____/

10

11                 Esquire Deposition Solutions
                   Remote Proceeding
12                 Zoom Videoconferencing
                   Thursday, 9:00 a.m.
13                 March 10, 2022

14

15

16

17         REMOTE DEPOSITION OF BERIC ANTHONY USHER

18

19         Taken before Marvalencia Miller, Florida
20    Professional Reporter, Notary Public in and for the
21    State of Florida at Large, pursuant to Notice of
22    Taking Deposition filed in the above case.

23

24

25
```

## Page 2

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF GREAT LAKES INSURANCE SE:
      GOLDMAN & HELLMAN
 4    8751 W. Broward Boulevard
      Suite 404
 5    Fort Lauderdale, Florida 33324
      BY:  Jacqueline Goldman, Esquire
 6

      ON BEHALF OF CHARTERED YACHTS MIAMI, LLC:
 7    MOORE & COMPANY, P.A.
      255 Aragon Avenue
 8    Suite 3rd Floor
      Coral Gables, Florida 33134
 9    BY:Kavan Vartak, Esquire

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1            - - - - -
 2             I N D E X
 3            - - - - -

 4

 5    BERIC ANTHONY USHER                    PAGE
      By Mr. Kavan Vartak                      4
 6

 7

 8             EXHIBITS FOR IDENTIFICATION

 9    Defendant's                           PAGE
10    No. 1    Photo of Petrus               13
         No. 2    Photo of transom door on   18
11                Petrus
         No. 3    Photo of swim ladder
12                container on Petrus        19
      No. 4    Denial Letter                 34
13    No. 5    Bareboat Charter Agreement    60
      No. 6    Charter Application           68
14    No. 7    Insurance Policy              76
      No. 8    Line Wrapped around Port      81
15                Propeller

16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1    Thereupon,
 2              BERIC ANTHONY USHER,
 3    was called as a witness and, having been first duly
 4    sworn, was examined and testified as follows:
 5              DIRECT EXAMINATION
 6    BY MR. VARTAK:
 7        Q.  Good morning, Mr. Usher.
 8        A.  Good morning.
 9        Q.  Can you state your full name for the
10    record?
11        A.  Yes.  My full name is Beric;
12    B-E-R-I-C, Anthony; A-N-T-H-O-N-Y, Usher;
13    U-S-H-E-R.
14        Q.  Okay, thank you.  Can you hear me
15    okay?
16        A.  Yes.  I can.
17        Q.  All right, good.  I'm going to assume
18    that you been through a deposition, so I don't have
19    to go through all the rules and stuff, but if you
20    wan to take a break, just let me know and you will
21    be free to take a break.  If you want to, you know,
22    stop for any reason, we can stop.
23              And I won't interrupt you while you
24    are speaking, you know, common courtesy; don't
25    interrupt me when I ask a question and we can get
```



Page 5

1  through this easily.
2      A.  Fine.
3      Q.  To start:  Who do you work for?
4      A.  I work for a company called Concept
5  Special Risks, Ltd.
6      Q.  Okay.  And what's your position or
7  title at Concept Special Risks?
8      A.  I'm the managing director.
9      Q.  Okay.  And you are here representing
10 Great Lakes Insurance as their corporate
11 representative, correct?
12     A.  That's correct.
13     Q.  Okay.  And what does your job entail
14 on a daily basis at Concept Special Risks?
15     A.  Basically, I'm responsible for all the
16 activities that are performed by Concept Special
17 Risks.
18         We operate as a managing general agent
19 performing the underwriting duties for Great Lakes
20 Insurance, which involves the selection of risk,
21 the underwriting, the issuance of policy documents,
22 the accounting, reporting, and claims handling.
23         So basically we perform all the
24 functions that an insurance company would do, as
25 though if -- as though we were a branch office.

Page 6

1  But we are, in fact, an independent contractor.
2      Q.  And you do this just not for Great
3  Lakes?  I assume there are also other companies you
4  manage?
5      A.  Yes.  We are also Lloyd's
6  coverholders, so we have binders in the Lloyd's
7  market.
8      Q.  How long have you been working with
9  GLI, Great Lakes?
10         I'm going to call Great Lakes GLI from
11 here on out, if that's okay.
12     A.  We started working with Great Lakes in
13 March of 2003.  So we had been underwriting for
14 them at the time of this incident for approximately
15 17 years.
16     Q.  And how long have you been managing
17 director at Concept Special Risks?
18     A.  Since its formation.
19         It's been known under a number of
20 names, but always with the same staff, the same
21 managing director.
22         To give you a brief, very brief
23 history.  It was originally a company called
24 TL Dallas Special Risks, which was a company, a
25 subsidiary of TL Dallas & Company Ltd.

Page 7

1         TL Dallas was a name,
2  Thomas Lessels Dallas.  He was a Scottish
3  gentleman, it has nothing to do with Texas.
4         We then merged with a company called
5  Osprey and became Osprey Special Risks; that was in
6  2008.
7         And then we did a structural demerger
8  from Osprey in 2013, and became Concept Special
9  Risks.
10        I have been the managing director
11 throughout that entire period.
12     Q.  How many people work at Concept
13 Special Risks, other than yourself?
14     A.  Seventeen.
15     Q.  Okay.  And is it safe to assume that
16 you been in the, I guess, insurance industry since,
17 I guess, you started working?
18     A.  Not; it's totally since I started
19 working, but yes, certainly 45 years.  I have been
20 managing a yacht program since February 10, 1991.
21     Q.  And how often do you get deposed as,
22 you know, managing director at Special Risks or as
23 a corporate representative?
24     A.  Quite frequently.  I couldn't even
25 guess how many depositions I've done since 1995,

Page 8

1  for example, I should think, as corporate
2  representative.  But in the hundreds.
3      Q.  And what is your educational
4  background?
5      A.  I graduated from grammar school in
6  1971, and went to work.
7      Q.  And do you have any special degrees or
8  licenses?  In yachting, for example?
9      A.  No degrees or licenses in yachting.
10 I'm an approved control person that has been
11 approved by the Financial Conduct Authority in the
12 United Kingdom, formerly the Financial Services
13 Authority, as a control person of an approved
14 entity within -- approved by the FCA.
15         So my background has been checked and
16 approved as having the ability to be a control
17 person.
18     Q.  Okay.  We can talk a little more of
19 specifics of the Petrus.
20         Are you familiar with the vessel
21 that's in question in this lawsuit?
22     A.  Yes, I am.
23     Q.  Okay.  Do you oversee and like, I
24 guess, manage all of the yachts that come in
25 through your office?



Page 9

1       A.  I'm responsible overall from a
2   supervisory perspective, but I don't see every
3   single vessel that comes through the door.  We are
4   a very large and busy office.  We write
5   approximately 7,000 yachts, we quote maybe 35,000
6   yachts.  It would be impossible for me to see all
7   of them.
8       Q.  Okay.  But in preparation for this
9   deposition, you did familiarize yourself with the
10  Petrus and the situation, the incident?
11      A.  Yes, I did.
12      Q.  And would you agree that the Petrus
13  was insured under a commercial yachting insurance
14  agreement?
15      A.  That's correct.
16      Q.  Okay.  And you would agree that that
17  means the vessel was going to be used for
18  commercial purposes?
19      A.  That's correct.
20      Q.  And that would mean GLI was aware that
21  Petrus would be used for commercial purposes,
22  correct?
23      A.  Yes.
24      Q.  Okay.  So what does the commercial
25  yachting agreement mean to GLI?  Or in the

Page 10

1   industry?
2       A.  Basically, all our policy languages
3   and policy wordings are bespoke.  That is to say,
4   they were drafted and prepared by us many years
5   ago.  This, which I believe was standard yacht
6   policy or SYP 8/COM, so that is Version 8 of the
7   commercial yacht policy.
8           We have basically four policy
9   languages that we use.  Two on standard yacht
10  policy, SYP; one is for private pleasure only; one
11  is for commercial charter.
12          We also have a premier yacht for more
13  modern vessels.  And likewise PYP, private and
14  pleasure policy and a PYP, primary yacht policy
15  commercial charter policy.
16          (Madame Court Reporter requesting
17      clarification.)
18  BY MR. VARTAK:
19      Q.  And on the last you just mentioned,
20  the PYP for private and pleasure policy; is that
21  correct?  Is that what you said?
22      A.  That is correct.
23      Q.  And the second one that you mentioned,
24  what was that again?
25      A.  That was a premier policy COM.  And

Page 11

1   that was premier yacht policy Version 5/COM, which
2   was issued at around the same time as the standard
3   yacht policy, Version 8/COM.
4           It's just that we had only done five
5   revisions of the PYP policy and eight revisions of
6   the standard yacht policy.
7       Q.  So what exactly is the difference
8   between the standard yacht policy for commercial
9   yachts versus the premier yacht policy for
10  commercial yachts?
11      A.  The premier yacht policy does not take
12  contain the same levels of depreciation because
13  it's designed to write more modern yachts.
14          The vessel in question here was
15  originally built in 1999 and therefore, it was over
16  ten years of age and would not have qualified for a
17  premier yacht policy.
18      Q.  Understood.  So the Petrus -- just
19  going to call it "vessel" from here on out -- it
20  was insured on March 6, 2019; is that correct?
21      A.  That's correct.
22      Q.  And the policy lasted from March 8,
23  2020, to March 8, 2021, correct?
24      A.  That's correct.
25      Q.  And then the policy renewed again from

Page 12

1   March 8, 2020 to March 8, 2021?
2       A.  That is correct.
3       Q.  And then on April 2, 2020, as part of
4   the renewal process, the vessel was surveyed by Lou
5   Gonzalez at Global International Marine Surveyors;
6   is that correct?
7       A.  That is correct.
8       Q.  And that survey noted that the vessel
9   was in decent condition to be insured but had a
10  couple of deficiencies; is that correct?  In that
11  list?
12          MS. GOLDMAN:  Objection.
13          THE WITNESS:  That's correct.
14  BY MR. VARTAK:
15      Q.  Okay.  All right.  So now one of the,
16  I guess, defenses or claims that GLI has made is
17  that vessel was not seaworthy and there was some
18  bad maintenance of the yacht.
19          So I'm going to show you a couple of
20  photos about that and ask you a couple of questions
21  about GLI claims.
22          And I'm going to share pictures, so
23  give me one moment to pull it up.
24          Can you see that on your screen?
25      A.  Yes, I can.



BERIC A. USHER                                              March 10, 2022
GREAT LAKES INS. vs CHARTERED YACHTS                        13—16

Page 13

1        Q.   And that's the vessel Petrus?
2        A.   I believe so, yes.
3            MR. VARTAK:  Okay.  So this was a
4    photo of the Petrus, mark this as
5    Exhibit 1.
6            (Thereupon, the Defendant's Exhibit
7    No. 1 was marked for identification.)
8    BY MR. VARTAK:
9        Q.   It's on Miami River.  I'm going to ask
10   you a couple of questions about this.
11           I am going to take it off the screen
12   real quick.
13           So in that photo I just put up
14   briefly, did you see the condition of the swim
15   platform while it was going down the river?
16       A.   Not specifically, no.  I mean, I saw
17   that it was clear of the water, if that's what you
18   referring to.
19       Q.   I'm going to point to the swim
20   platform.
21           This is the swim platform of the
22   vessel, correct? (Indicating.)
23       A.   Yes.
24       Q.   Okay.  And you can see that it's above
25   the water?

Page 14

1        A.   Yes.
2        Q.   And the water is not, you know, you
3    know, covering it or it's not underwater.  It's not
4    awash of the water, correct?
5        A.   That's correct.
6            But as you say, it's in the Miami
7    River.  There is no bow wave there either, so I
8    wouldn't think it's moving very fast.
9        Q.   Right, right.  So you would agree with
10   me that the Miami River is a no-wake zone, so
11   vessels are not allowed to go very fast?
12       A.   That's correct.
13       Q.   And just as a question, like, have you
14   ever -- have you been to Miami before?
15       A.   Yes.
16       Q.   Okay.  So you are familiar about
17   the -- with the river and the city, and the layout
18   of the city?
19       A.   Reasonably familiar.
20       Q.   Okay.  And do you know if Leopard
21   vessels, like the one I just showed for the Petrus,
22   do they normally have the swim platform under water
23   when they are underway?
24       A.   No, I don't know.
25       Q.   You don't know?  Okay.

Page 15

1            So based on the photo I showed you,
2    and you saw the wake and the swim platform was not
3    underwater, doesn't that strike you as strange that
4    your own expert that GLI hired, Michael Grant, who
5    did his own testing and concluded with his own
6    testing, that the swim platform normally is
7    underwater and the swim platform is awash?
8            MS. GOLDMAN:  Objection.
9    BY MR. VARTAK:
10       Q.   -- found it strange?
11           MS. GOLDMAN:  Objection.
12           He is not the expert, number one.  But
13   I think your questions are better put to
14   Mr. Boulon.  Mr. Usher is not designated as
15   an expert in this case.
16           But you can answer.
17           MR. VARTAK:  Yes, he can answer.
18           I was just asking as his opinion.
19   BY MR. VARTAK:
20       Q.   Does that expert opinion that you
21   hired sound strange, based on the visual evidence?
22           MS. GOLDMAN:  Objection.
23           THE WITNESS:  No.  That's why --
24   that's why I hire an expert.  I'm not a
25   marine architect; I am an underwriter.

Page 16

1            So we obviously appointed someone to
2    investigate the claim.  The field surveyor
3    that did the investigation was indeed
4    Michael Grant.
5            But all our communications were with
6    Revel Boulon of Sedgwick, who is the firm
7    that we appointed immediately following the
8    advice of the loss.
9    BY MR. VARTAK:
10       Q.   Do Revel Boulon's opinions contradict
11   Michael Grant's opinions?
12       A.   No, I believe they endorsed them.
13       Q.   Okay.  So when Michael Grant says that
14   the Petrus isn't -- the swim platform is normally
15   awash and underwater when underway, that would mean
16   Revel Boulon also agrees with that conclusion?
17           MS. GOLDMAN:  Objection.
18           THE WITNESS:  I assume so.
19   BY MR. VARTAK:
20       Q.   Okay.  And GLI agrees with that
21   conclusion?  That the Petrus swim platform is
22   underwater when it's underway?
23           MS. GOLDMAN:  Objection.
24           THE WITNESS:  To the extent that we
25   are away, yes.

BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
17—20

Page 17

1      We appointed someone to investigate
2   who is highly qualified and that we are
3   familiar with, and that was the report that
4   we received.  And then subsequently we
5   obtained from the same person,
6   Revel Boulon, expert testimony as to what
7   he felt the cause of the loss was.
8      So as far as I can determine, yes,
9   that's what we relied upon was the
10   information provided to us by the expert
11   and the person who was on the scene and
12   viewing the vessel postincident.
13 BY MR. VARTAK:
14   Q.  Okay.  I'm going to show you another
15 photograph here real quick.
16      Can you see this picture?
17   A.  Yes.
18   Q.  I'm going represent to you that this
19 is the Petrus in Biscayne Bay.  And it's going
20 pretty close to full speed.
21      Would you agree with that?
22   A.  I don't know if it's the Petrus.  I
23 will take your word for it, the fact that it's
24 Petrus.
25      If you are saying that that's when

Page 18

1 platform is not under the water, then I can see
2 that's not under the water.
3   Q.  Okay.  And you would agree with the
4 size of the wake that you see here, it's going
5 pretty fast, correct?
6   A.  Yes, I would say.
7   Q.  Okay.  But the swim platform here is
8 dry?  It's not underwater?
9   A.  Correct.
10      MR. VARTAK:  Okay.  I'm going to mark
11   that as Exhibit 2, this picture.
12      (Thereupon, the Defendant's Exhibit
13   No. 2 was marked for identification.)
14 BY MR. VARTAK:
15   Q.  So I'm going to put the picture back
16 up and I have another question for you.
17      This is the transom door of the
18 vessel, correct?  Right here?
19   A.  I believe so, yes.
20   Q.  Okay.  And it too is not touching the
21 water and no water is going up onto the transom
22 door area?
23   A.  I can't see any, no.
24   Q.  Okay.  I'm going to put another
25 picture on the screen.

Page 19

1      The -- so this is the Petrus as you
2 can see, right?
3   A.  Yes.
4      (Thereupon, Defendant's Exhibit No. 3
5      was marked for identification.)
6 BY MR. VARTAK:
7   Q.  Okay.  So another issue in the case is
8 that the swim ladder container.
9      Do you see the swim platform here?
10   A.  Yes.
11   Q.  Okay.  So below that is this little
12 white space, and in the little white space is the
13 swim ladder container.  That's where the swim
14 ladder kind of goes in and slides underneath the
15 platform.
16      Do you see where I'm gesturing?
17 (Indicating.)
18   A.  Yes.
19   Q.  Okay.  So keeping in mind that the
20 swim ladder container is right here, back to the
21 other photograph.
22      So in this picture, the swim ladder
23 container -- I would point to right here, below the
24 swim platform -- would you say that the ladder
25 container is awash or flooded with water?

Page 20

1 (Indicating.)
2      MS. GOLDMAN:  Objection.
3      THE WITNESS:  I can't really see from
4      the photograph.
5 BY MR. VARTAK:
6   Q.  Let me try to zoom in real quick.
7      So I guess orient ourselves.  The
8 white part of the vessel right here on the picture;
9 it is well above the water line.  Correct?
10 (Indicating.)
11      MS. GOLDMAN:  Objection.
12      THE WITNESS:  As we discussed earlier,
13      that's in the Miami River.
14 BY MR. VARTAK:
15   Q.  Yes.  So the vessel going pretty slow,
16 correct?
17      So the vessel is going very slowly in
18 the river, correct?
19   A.  Correct.
20   Q.  Okay.  And when it's going at the slow
21 speed in the river, the water line is well below
22 the swim platform, correct?
23      MS. GOLDMAN:  Objection.
24      THE WITNESS:  If you say so.  I can't
25      really see much from that photograph.  You

Page 21

1      would have to get from reverse view.
2           But you know, I mean, the photograph
3      is self-evident, it just -- I am just
4      looking at it the same as you are.  I can't
5      see.
6  BY MR. VARTAK:
7      Q.   But you can see where the water is,
8  right?
9      A.   I can see where the water is.
10     Q.   And you can see where the swim
11 platform is?
12     A.   Yes.
13     Q.   And the water is below --
14     A.   I can see the white mark where you
15 said, but I can't see where the insert -- inset for
16 the swim ladder is.
17          But at the end of the day, as I said,
18 I'm not a marine technician.  I am just looking at
19 a photograph.
20     Q.   Yes, I understood that.
21          But I just wanted to ask you:  Based
22 on what you can see in this photograph, the water
23 is not above the swim platform or swim ladder
24 container?
25          MS. GOLDMAN:  Objection.  Asked and

Page 22

1      answered.
2  BY MR. VARTAK:
3      Q.   So going to the issue of lack of
4  maintenance.
5           So you said you were aware that when
6  GLI renewed the insurance on the vessel, there was
7  a preinsurance survey conducted by Lou Gonzalez,
8  correct?
9      A.   That we were subsequently provided
10 with a survey, yes.  We required a new survey to be
11 done in 2020.  We had on file the survey that was
12 conducted in 2017.
13     Q.   Yes.  And then the survey was
14 conducted on April 2, 2020, correct?
15     A.   That's correct, yes.
16     Q.   And are you aware that Mr. Pack, the
17 owner of CYM, the defendant here, he required a
18 regular service maintenance company to maintain the
19 vessel?
20     A.   No.
21          MS. GOLDMAN:  Objection.
22          THE WITNESS:  I don't disbelieve it,
23     but I was not aware of that.
24 BY MR. VARTAK:
25     Q.   You were not aware.  Okay.

Page 23

1           And are you aware of the name, Craig
2  Koblitz?
3      A.   No.
4      Q.   Or CK Dockside?
5      A.   No.
6      Q.   Have you reviewed all the documents in
7  discovery that have been produced so far in this
8  case?
9      A.   Yes.  I just don't recall those names.
10     Q.   Okay.  And who is it -- who is it at
11 Concept Special Risks that handles this case?
12     A.   I believe this case was initially
13 handled by Sarah De Lacey Sims.
14     Q.   And Sarah, she is in regular
15 communication with Revel Boulon?
16     A.   Yes.  My entire claims department is
17 in regular communication with Revel Boulon.
18     Q.   Okay.  But you don't have any direct
19 communications with Michael Grant?
20     A.   We have had in the past, but not on
21 this issue.
22     Q.   Not on this case?
23     A.   No.
24     Q.   Okay.
25     A.   I -- I know Michael Grant and I met

Page 24

1  Michael Grant, but we have not corresponded on this
2  case.
3      Q.   Do you know if Michael Grant ever
4  spoke to Craig Koblitz about this case and his
5  maintenance on the vessel?
6      A.   No.
7      Q.   Do you know if Revel Boulon has spoken
8  to Craig Koblitz about this case and the
9  maintenance on the vessel?
10     A.   No.
11     Q.   Do you know if anyone at Great Lakes
12 or Concepts Special Risk have ever spoken to
13 Craig Koblitz about this case?
14     A.   Concept Special Risks certainly
15 hasn't.  I have no idea about Revel Boulon or
16 Michael Grant.
17     Q.   And you are aware that Charter Yachts
18 Miami produced the documents from Craig Koblitz in
19 this case in discovery?
20     A.   Could you repeat?
21     Q.   I said:  Are you aware that CYM has
22 produced the documents from Craig Koblitz in
23 discovery for this case?
24     A.   No, I don't recall seeing anything of
25 that nature.  He may have provided documents.



Page 25

1        I mean, who is Craig Koblitz to start
2   with?
3        Q.   Well, I will just tell you he is the
4   mechanic and the maintenance person that was hired
5   to maintain the vessel.
6        I'm going to get more into his
7   maintenance, right now actually.  So I will just
8   tell you that he did work on this vessel.
9        And I guess -- are you aware that on
10  July 8, 2020, Mr. Koblitz removed the swim ladder,
11  and on July 9, 2020, repaired the swim ladder's
12  cable rollers?
13       A.   No.
14       Q.   Would it surprise you to learn that?
15  That he had done maintenance on the swim platform
16  and the swim ladder?
17       A.   Not especially, no.
18       Q.   And are you aware that on August 6,
19  2020, Mr. Koblitz conducted troubleshooting on the
20  aft bilge pump?
21       A.   No.
22       Q.   Would surprise you that he did?
23       A.   No.  If he was providing regular
24  maintenance to the vessel, then it wouldn't
25  surprise me anything that he did.

Page 26

1        Q.   Okay.  And are you aware that on
2   August 7, 2020, Mr. Koblitz showed us he rewired
3   the aft bilge pump in order to fix its alarm and
4   installed a new 500-gallon-per-hour pump in the
5   garage?
6        A.   No.
7        Q.   And are you aware that on August 12th
8   Mr. Koblitz installed new check valves on the black
9   water pump on the vessel?
10       A.   I'm not aware of any maintenance that
11  Mr. Koblitz did on the vessel.
12       Maybe Mr. Boulon is aware.  I don't
13  know.
14       Q.   Okay.  And are you aware that on
15  October 11, 2020, Mr. Koblitz also disassembled the
16  bilge pump and performed maintenance on its parts?
17       MS. GOLDMAN:  Objection.
18       THE WITNESS:  Well, that's kind of
19       asked and answered.
20       I'm not aware of any maintenance that
21       was performed on the vessel by Mr.- --
22       whatever his name was.
23  BY MR. VARTAK:
24       Q.   Okay.  And on October 17, 2020, are
25  you aware Mr. Koblitz cleaned and assembled the

Page 27

1   pumps and checked out their motors?
2        MS. GOLDMAN:  Objection, Kavan, for
3       all of these questions.
4        There is, you know, it's -- it's
5       not -- not facts in evidence.  And he also
6       doesn't know.
7        So can we move on from this?
8   BY MR. VARTAK:
9        Q.   Okay.  One last question.
10       And are you aware or has anyone ever
11  told you that Mr. Pack said he had -- he checked
12  the bilge pump the day before the day of the
13  incident, November 6, 2020?
14       A.   No.
15       And that, I think, is contrary to the
16  previous statements made where the -- I believe
17  that the bilge pumps hadn't been checked.  But I
18  would have to refer to the file.
19       There was suggestions that they did
20  not regularly check the bilge pumps.  But if he
21  did, if he says he did, then I presume he has been
22  deposed.
23       Q.   Okay.  And regarding the allegation
24  that the bilge pump wire was cut, are you aware
25  that the wire -- it was clean and bright,

Page 28

1   indicating a recent break in the wire?
2        A.   There was some --
3        MS. GOLDMAN:  Objection.
4        THE WITNESS:  There was some mention
5       of that in Mr. Boulon's rebuttal statement
6       about the expert witness statement that he
7       secured for your client.
8   BY MR. VARTAK:
9        Q.   And wouldn't it be kind of odd to you
10  that the pipe [sic] was so clean and bright when
11  your own expert said that it was preexisting the
12  incident?  Wouldn't it kind of be odd to you that
13  the, you know, the wire wasn't covered over by sea
14  material and rusty and kind of dirty?
15       MS. GOLDMAN:  Objection.
16       THE WITNESS:  Presumably not if it's
17       just been repaired in -- whenever you said
18       it was repaired, in August.
19  BY MR. VARTAK:
20       Q.   And after the missing parts that
21  Michael Grant stated in his report -- well, let's
22  back up a little bit.
23       Have you read Michael Grant's survey
24  or report from November 2020?
25       A.   I read Revel Boulon's report which was



Page 29

1  based on Michael Grant's report.  But I haven't
2  read Michael Grant's actual field report.
3      Q.  Okay.  And is there any reason why
4  not?
5      A.  It wasn't provided to me.
6          We didn't appoint Michael Grant;
7  Sedgwick appointed Michael Grant.
8      Q.  But it's true that Michael Grant's
9  report is the basis for Sedgwick or Revel Boulon's
10  report?
11     A.  You would have to double-check with
12  Revel Boulon.
13         But I assume since he appointed
14  Michael Grant to do the field survey, that he based
15  his report on the report provided to him by
16  Michael Grant.
17     Q.  So when you reviewed Revel Boulon's
18  report, wouldn't it have been important to read the
19  underlying report from Michael Grant?
20     A.  I believe it referred to the fact that
21  Michael Grant had conducted the field survey, but
22  it did not attach Michael Grant's report.  What it
23  did was it provided the report to us, that we had
24  commissioned him to provide.
25     Q.  Okay.  Both Michael Grant and Revel

Page 30

1  Boulon agreed in their reports that when
2  Michael Grant went on the vessel, the vessel was
3  apparently missing life rafts, the EPIRB and the
4  distress flares.
5          So my question to you is:  What, if
6  anything, did the life raft or EPIRB, distress
7  flares, have to do with how the vessel took on
8  water?
9          MS. GOLDMAN:  Objection.
10         THE WITNESS:  Nothing.
11  BY MR. VARTAK:
12     Q.  And are you aware that the only reason
13  the life rafts, EPIRB and distress flares were not
14  cited during Michael Grant's survey was because
15  they were lost and they floated away during the
16  sinking on the Miami River per the incident?
17         MS. GOLDMAN:  Objection.
18         THE WITNESS:  No, I'm not aware of
19  that.
20  BY MR. VARTAK:
21     Q.  Would it surprise you to learn that
22  fact?
23         MS. GOLDMAN:  Objection.
24         THE WITNESS:  Well, as far as I'm
25  aware, the vessel didn't fully submerge.

Page 31

1          Yeah, it would surprise me a bit that the
2          flares and the life rafts disappeared.
3  BY MR. VARTAK:
4      Q.  Assuming that they did float away
5  during the loss, wouldn't that be the reason why
6  Michael Grant wasn't able to see them since they no
7  longer existed on the vessel due to the loss?
8      A.  If they had floated away, yes.
9      Q.  So in your words and in GLI's opinion,
10  as a corporate rep, how did the water enter the
11  engine room for the vessel?
12         MS. GOLDMAN:  Objection.
13         Again, a question better put to
14  Mr. Boulon.
15         THE WITNESS:  Yes.  We basically
16  relied upon the report provided to us by
17  Revel Boulon.  And his subsequent expert's
18  report and now his rebuttal report.
19         So everything that Mr. Boulon said; we
20  trusted.  We have experience in dealing
21  with Mr. Boulon and Sedgwick for many
22  years.  He is eminently qualified.  And
23  there is no incentive as far as he is
24  concerned to do anything but provide
25  anything but a full factual and his

Page 32

1          assessment of what the cause of loss is.
2  BY MR. VARTAK:
3      Q.  Okay.  But I'm not talking about his
4  report; I'm talk about the legal claims put against
5  CYM for the basis of denying coverage.
6          So I want to know what Great Lakes and
7  Concept Special Risks Reasons are for denying
8  coverage.  And one of those reasons was, you know,
9  water entered the engine room.
10         But my question is:  How did the water
11  enter the engine room, according --
12         MS. GOLDMAN:  I believe he answered
13         your question, Kavan.  He said he is
14         relying upon Mr. Boulon's conclusions.
15         MR. VARTAK:  I want him to answer
16         again.
17         MS. GOLDMAN:  Asked and answered.
18         THE WITNESS:  Okay.  Just for the
19         record and for clarity:  We appointed
20         Sedgwick immediately following advise of
21         the claim.  We received the advise of the
22         claim on the 11th of November, 2020, at
23         1824 hours, which is outside office time.
24         And therefore appointed Sedgwick on the
25         12th of November, 2020, which was

ESQUIRE
DEPOSITION SOLUTIONS

BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
33–36

Page 33

1 acknowledged by Revel Boulon.
2      We received his report on the
3 8th of December, 2020, which detailed these
4 particular issues.
5      We therefore immediately referred the
6 report to Great Lakes because of the the
7 size of the claim and because of the
8 disturb -- the disturbing nature of the
9 contents of the report.
10      Within -- when we referred it to Great
11 Lakes, we recommended that we sought a
12 legal opinion as to whether or not there
13 was a basis of denial.  We therefore --
14 Great Lakes agreed that we should seek a
15 legal opinion.  Which we did seek a legal
16 opinion.  And following that legal opinion,
17 we denied the claim and we filed the
18 complaint.
19      I'll just give the chronology.  All
20 right?
21      We received the report on the 8th of
22 December.  We sent it to Great Lakes on the
23 8th of December.  Great Lakes agreed to
24 refer it to Goldman & Hellman for legal
25 opinion on the 8th of December, which was

Page 34

1      done by house to Goldman & Hellman.  And
2      the preliminary opinion was received on the
3      9th of December, and the letter of denial
4      was sent on the 11th of December.
5      So it was all moving pretty quickly.
6 BY MR. VARTAK:
7      Q.  So within three days the receiving the
8 report Great Lakes denied the claim; is that
9 correct?
10      A.  Yes.
11      Q.  Sharing my screen real quick for the
12 document.
13      This is the -- this is the letter that
14 you were talking about?  The denial letter?
15      A.  That's correct.
16      (Thereupon, the Defendant's Exhibit
17      No. 4 was marked for identification.)
18 BY MR. VARTAK:
19      Q.  Okay.  So in third paragraph here, can
20 you please just read this paragraph that I
21 highlighted.
22      A.  Yes.  "Please be advised the policy
23 contains a provision which states that the policy
24 of marine insurance is intended to provide coverage
25 against accidental physical loss or damage to a

Page 35

1 scheduled vessel.  The investigation referenced
2 herein has established that there was no such
3 accident since the loss was the direct result of
4 sea water entering the vessel via an open transom
5 door at the vessel's stern."
6      Q.  Okay.  So you would agree with me that
7 GLI's conclusion that while the vessel was normally
8 underway on the Miami River, the water on the day
9 of the incident came in through the open transom
10 door as alleged by GLI in that letter?
11      MS. GOLDMAN:  Objection.
12      THE WITNESS:  As reported to us by
13      Revel Boulon.
14 BY MR. VARTAK:
15      Q.  So it is GLI's conclusion that the
16 vessel, the water -- that water comes over the swim
17 platform, through the transom door, into the
18 compartment behind the transom door, and then into
19 the garage of the vessel during normal operations.
20      Is that a correct representation of
21 your last statement right there?
22      A.  Well, the information provided to us,
23 but provided to us by Revel Boulon and Sedgwick.  I
24 don't think that says that, under the normal
25 operation of the vessel.

Page 36

1      I mean, presumably the vessel had
2 operated since 1999 without taking water in through
3 the open transom door.  So presumably up until that
4 point, the vessel was watertight.
5      Q.  My question is:  How did water get to
6 the transom door in the first place?
7      A.  Because it wasn't watertight.
8      MS. GOLDMAN:  Objection.
9      Again, Kavan.  Mr. Usher is not an
10      expert.  These are questions for
11      Mr. Boulon.
12      MR. VARTAK:  I'm not asking him for
13      expert opinion; I'm asking him what the
14      basis of the legal claims he made are.
15      MS. GOLDMAN:  And those are based on
16      the conclusions of Mr. Boulon.
17      But keep asking, you got the time.  I
18      will just keep objecting.
19 BY MR. VARTAK:
20      Q.  According to GLI, on the day of the
21 incident, the water had came up to the seal of the
22 transom door; is that correct?
23      MS. GOLDMAN:  Objection.
24      THE WITNESS:  It's what -- it's what
25      Sedgwick placed -- put in their report.



BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
37–40

Page 37

1        In Sedgwick and Revel Boulon's
2   opinion, the vessel was not seaworthy at
3   the time of the incident, in as much as it
4   was not watertight.
5   BY MR. VARTAK:
6        Q.  Do you know what Revel Boulon's
7   investigation consisted of?
8        A.  Do I know what?
9        Q.  What Revel Boulon's investigation
10  consisted of?
11       A.  No.  You would have to ask
12  Revel Boulon.  All I know is what his conclusions
13  were.
14       Q.  Did you ever ask him what his
15  investigation did?
16       A.  No.
17       Q.  Or how he did his investigation?
18       A.  No.  I trust him as a highly
19  professional and highly qualified marina draftsman
20  and marine surveyor and third-party administrator
21  to do whatever is necessary to complete his report.
22       Q.  Did you ever ask for any documents
23  that would support Revel Boulon's opinion in his
24  report?
25       A.  No.  That would be Revel Boulon's

Page 38

1   responsibility.
2        Q.  Did he ever provide you the underlying
3   documents?
4        A.  No.
5        Q.  Wouldn't it the strike you as odd that
6   Revel Boulon never would have, you know, gone to
7   the vessel and tried to fill up the other side of
8   the transom door comportment to see how the water
9   would flow in, over the swim platform, through the
10  transom door, into the compartment behind the door
11  and then into the garage?
12       A.  No.  As I say, I'm not a marine
13  architect or marine expert.  All right?  I would
14  anticipate and expect Mr. Boulon to do whatever he
15  felt was necessary in order to ascertain with what
16  the cause of loss was and the condition the vessel
17  was at the time of the loss.
18       And that he did as far as I'm
19  concerned, because otherwise he would not have had
20  the confidence to provide us with the report with
21  such complete conclusions.
22       Q.  You trust -- and you trust Boulon's
23  theory and conclusions and opinions that water
24  entered the engine room through passing in -- the
25  transom door?

Page 39

1        A.  I trust Revel Boulon.  I'm not
2   qualified to question his findings.
3        Q.  You don't think it's necessary to
4   question him or ask him for the backup or
5   underlying documents before, you know, going
6   forward with his theories?
7        MS. GOLDMAN:  Objection.
8        THE WITNESS:  No.  As far as I'm
9        concerned, if we come into possession of
10       additional documents or whatever, by
11       whatever route, we would immediately
12       referred them back to him for his expert
13       opinion.
14       He is the expert; we are just
15       insurance people.
16  BY MR. VARTAK:
17       Q.  Well, whatever Boulon says, you just
18  trust on his word alone?
19       MS. GOLDMAN:  Objection.
20       THE WITNESS:  Yes.  Otherwise we
21       wouldn't commission him to do the report.
22  BY MR. VARTAK:
23       Q.  You don't know if he did any
24  independent testing himself of the -- of the wiring
25  of the transom door, correct?

Page 40

1        MS. GOLDMAN:  Objection.
2        THE WITNESS:  You would have to ask
3        Mr. Boulon what he did to arrive at those
4        conclusions.
5   BY MR. VARTAK:
6        Q.  And GLI never did any independent
7   testing themselves?
8        MS. GOLDMAN:  Objection.
9        THE WITNESS:  They would have retained
10       someone to do any testing.  We had already
11       retained someone, i.e., Revel Boulon.
12  BY MR. VARTAK:
13       Q.  And going back to the statement that
14  GLI made in their denial report, denial letter,
15  that the transom door was open.
16       Are you aware that wiring for the
17  transom door is only a few feet above the door in
18  the garage?
19       MS. GOLDMAN:  Objection.
20       THE WITNESS:  No.  We are not aware of
21       the finite aspects of the vessel; we are
22       only aware of what we were insuring as a
23       vessel.  We didn't look at the plans of the
24       vessel or anything like that.  All we did
25       was we insured the vessel which had been

Page 41

1    surveyed.
2         The insured had signed a letter
3    confirming they complied with all the
4    recommendations.  Therefore as far as we
5    were concerned, we would be okay to write
6    the policy.
7         All the technical aspects as regards
8    the vessel's design, construction,
9    proximity of wires, whether the swim
10   platform was submerged when underway, at
11   what plane the vessel achieved when it was
12   at optimum speed; all those questions could
13   be directed to the expert because they
14   would know and I wouldn't.
15   BY MR. VARTAK:
16        Q.  Well, would you agree with me that if
17   the wiring to the transom door got wet, it would
18   also damage the electronics and the wiring?
19        MS. GOLDMAN:  Objection.
20        THE WITNESS:  Again, I have no idea of
21   what the arrangements are as regards
22   protection of the wiring from watering
23   grass or whatever.
24        Again, that is a matter for the expert
25   to look at.  I'm not familiar in that

Page 42

1    detail with the design of the vessel.
2    BY MR. VARTAK:
3         Q.  Well, I'm not specifically asking you
4    about design of vessel, I'm asking you:  Do you
5    know about wiring and the electronics, correct?
6    You know about --
7         MS. GOLDMAN:  Objection.  He just said
8    no.
9    BY MR. VARTAK:
10        Q.  Well, you know wiring can't get wet,
11   right?
12        MS. GOLDMAN:  Objection.  He is not an
13   expert.
14        Are you asking him just as a
15   layperson?
16        MR. VARTAK:  Yes, in his opinion.
17        MS. GOLDMAN:  Then go ahead.
18   BY MR. VARTAK:
19        Q.  -- wiring can get wet?
20        A.  Well, presumably wiring can get wet.
21   I have wiring in my garden that
22   regularly gets wet.  If it's protected against
23   watering grass, then of course wiring can get wet.
24   I have wiring in my swimming pool for the lighting.
25        I have, you know, there are all sorts

Page 43

1    of wires that are external and are exposed to
2    water.  So from a layman's perspective, I see no
3    reason why wiring couldn't get wet.
4         Is it designed to get wet?  It would
5    depend on where it was located, whether it was
6    intended to get wet.  If it was intended to get
7    wet, then presumably such precautions would be
8    taken to prevent that causing a problem.  If it was
9    not intended to get wet, then yes, normally
10   speaking, electricity and water don't go together
11   very well.
12   BY MR. VARTAK:
13        Q.  Right.  So if it wasn't intended to
14   get wet, it would cause a short-out in that wiring?
15        MS. GOLDMAN:  Objection.
16        THE WITNESS:  Presumably as a layman,
17   quite possibly.  Yes, I mean, you know, you
18   don't throw electric power into the bath.
19        MR. VARTAK:  All right.  Can we take a
20   short ten-minute break?  Been about an
21   hour.
22        (Whereupon, a break was taken.)
23   BY MR. VARTAK:
24        Q.  Okay.  So have you approximately ever
25   interviewed Michael Grant for this case?

Page 44

1         A.  Have I interviewed Michael Grant?
2         Q.  Yes.  Regarding the facts and
3    knowledge that he knows about the case.
4         A.  No.  I relied on Revel Boulon.
5         Q.  Have you interviewed Revel Boulon
6    about this case?  About the facts and his opinions?
7         Apart from reading his report
8    obviously.
9         A.  No.  I have just read his report, I
10   haven't discussed his particular case.
11        I have met Revel Boulon.  I met him in
12   November most recently.  But we didn't discuss this
13   case.
14        Q.  So I guess it is correct to say for
15   Revel Boulon, you have never discussed the case
16   with him, either in person or on the phone?
17        A.  I haven't, no.  Maybe one of my claims
18   people has.
19        But there is nothing in the file.  And
20   let's see, everything on the file will be by
21   e-mail.
22        Q.  And you've never e-mailed with
23   Revel Boulon about this case?
24        A.  I personally haven't, no.  I mean,
25   there have been e-mail exchanges between our office



Page 45

1   and Revel Boulon when we appointed him, when we
2   received his preliminary findings.  And we would
3   have copied him in on the denial, just as a
4   courtesy.
5       Q.   So when is the last time you or your
6   office has spoken to or e-mailed Revel Boulon about
7   this case?
8       A.   The 11th of December, 2020, was the
9   last time we communicated directly with
10  Revel Boulon.  There have been numerous
11  communications that we have been copied into
12  between the -- our attorney and Revel Boulon.
13      Q.   And then that December 11th date,
14  that's the date that the letter of denial was
15  written; is that correct?
16      A.   That's correct.  We sent him a copy of
17  the denial letter as a courtesy.
18      Q.   And so that December 11th date, you
19  would agree with me that that is 34 days after date
20  of incident, which took place in November?
21      A.   That's correct.
22      Q.   Okay.  Is there a minimum amount of
23  time for GLI or Concepts Special Risk under its
24  internal covered policy to investigate a claim
25  before publishing a denial letter or a reservation

Page 46

1   of rights letter?
2       A.   No.  I mean, because the investigation
3   can quite frequently take much, much longer.  It
4   could be 60, 90, 120 days before a denial letter is
5   sent out.  It depends -- we are not going to deny a
6   claim until we are sure that it should be denied.
7       So in this instance, the report from
8   Revel Boulon was adequate as far as we were
9   concerned to raise sufficient concern to seek a
10  legal opinion.
11      Q.   Well, let's go through GLI's processes
12  and internal investigation procedures.
13      So after GLI or after Special Risks
14  receive a claim, a notice of a claim, what is the
15  first thing you guys do?
16      A.   We appoint a surveyor or an adjuster.
17      Q.   Sorry, you appoint a what?
18      A.   Surveyor and/or adjuster.
19      Q.   And how do you --
20      A.   Just to clarify, sorry Kavan, let me
21  just clarify that because that's a rather ambiguous
22  statement.
23      We use a number of surveyors who are
24  not adjusters, and we use some surveyors who are
25  also adjusters.  Revel Boulon is both a surveyor

Page 47

1   and an adjuster.
2       So therefore when I say "and/or
3   adjuster" it's frequently we do our own
4   adjustments, based on a survey where we have used a
5   direct field surveyor.
6       In this instance, the surveyor was
7   Michael Grant who did the field survey on behalf of
8   Revel Boulon.  Revel Boulon was acting as both
9   surveyor and adjuster.
10      Q.   How do you guys go about finding
11  surveyors and adjusters for cases?
12      A.   It's normally on the basis of where
13  the loss occurred.  We have a number of surveyors
14  and adjusters that are approved, we have a panel of
15  them.  So depending on the circumstances, the type
16  of incident, and so on.
17      We have specialist fire reconstruction
18  people, we have specialist investigators to
19  investigate about the injury and protection
20  indemnity-type losses, and we have surveyors that
21  deal with physical damage losses.
22      So depending on where the incident
23  occurred.  Obviously if the incident occurred in
24  the U.S. Virgin Islands, we would not appoint
25  Revel Boulon because we have people in the U.S.

Page 48

1   Virgin Islands that would deal with that.
2       So Revel Boulon and Sedgwick is an
3   approved adjuster.  We do significant checks to
4   establish their credentials and so on, we put them
5   forward for agreement by Great Lakes to be
6   utilized.  And so that enables us to appoint them
7   immediately rather to seek approval to appoint
8   someone.
9       Q.   Okay.  And when was Revel Boulon
10  appointed?
11      A.   He was appointed on the 12th of
12  November.
13      Q.   So the incident occurred November 7th,
14  and appointed November 12th; correct?
15      A.   We were advised of the incident at
16  1824 hours on the 11th of November.  Because that
17  was 6:24 in the evening and the office was closed,
18  Revel Boulon was not appointed until the following
19  morning.
20      Q.   Okay.  What are the first steps that a
21  claims manager at Concepts Special Risk does upon
22  receiving a claim?
23      A.   Appoints the surveyor or the adjuster.
24  Or commissions an investigation.
25      Q.   Okay.  And what's the next thing that



Page 49

1  happens after the surveyor or adjuster is
2  appointed?
3       A.   The surveyor/adjuster provides a
4  report.  If the report is delayed, then we will
5  chase them for the report.
6          In the instance, the report was not
7  unduly delayed.  So once we received the report,
8  then we know exactly what our next steps are going
9  to be, depending on the contents of the report.
10      Q.   Okay.  And in this case, after the
11  report, you notified Great Lakes and then sought a
12  legal opinion?  Is that it?
13      A.   We notified Great Lakes and we
14  recommended to them that we seek a legal opinion.
15  Which they agreed.  And then we sought the legal
16  opinion.
17      Q.   So Great -- so Concept Special Risks
18  and Great Lakes, they never did any independent
19  investigation of their own, other than hire
20  Revel Boulon, correct?
21      A.   That's correct.
22      Q.   Is there any internal policy or
23  procedures as to how claims are supposed to be
24  handled?
25      A.   We have internal procedures, but it

Page 50

1  wouldn't affect this claim because of the quantity
2  of the claim.  As far as we are concerned, we have
3  claim-settling authority up to $350,000 where we
4  can deal with the claim unilaterally.  If the claim
5  is anticipated to exceed $350,000, it will
6  automatically be referred to Great Lakes.
7       Q.   And as to the investigation part of
8  the claims-handling process, do you guys have any
9  internal policy or procedure, you know, other than
10  just appointing someone to take care of it, do you
11  guys have to do anything else?
12      A.   Well, not beyond what I just
13  explained.  Effectively once we receive the report,
14  there will be a determination as to whether further
15  investigation is required.
16          If the report is what we perceive to
17  be missing something, we may ask the surveyor to
18  revisit a particular area.  Obviously, infrequently
19  we do not refer claims to Great Lakes because they
20  are within our ambit -- ambit to and authority to
21  proceed towards settlement.
22          But in the event that we are going to
23  deny a claim or we are going to recommend a legal
24  opinion, then we would always approach Great Lakes
25  because effectively, any complaint that is filed

Page 51

1  will be utilizing their name.  So we would not do
2  that without specific approval.
3       Q.   Are there any policies or procedures
4  written down somewhere?  Like in a handbook or a
5  manual or something?
6       A.   It's an internal matter.
7       Q.   So when -- when you say that you fully
8  investigated the claim, what does that look
9  for -- what does that look like to you?
10          For example, like when you look at a
11  claim and say that this has been fully
12  investigated, what does that mean to you?
13      A.   It means as far as we're concerned,
14  that the -- the report that we received is, in our
15  opinion, complete.  And say if there were areas of
16  concern that have not been addressed within the
17  report, we would ask the surveyor to revisit it.
18          He is our eyes and ears on the ground,
19  if you like.  So we have no basis of establishing
20  anything other than by the person that we have
21  appointed.  Who is the local person.
22          We are not going to fly down and do
23  our own investigation, nor do we have people
24  qualified to do those things.  What we may do,
25  however, on occasions is say to the surveyor:  We

Page 52

1  don't think you looked into this aspect.  Or could
2  you look into this aspect.  Or whatever.  If we
3  don't think the report is complete.
4          In this instance, however, the report
5  appeared very complete.
6       Q.   Do you have any procedures or rules
7  that guide or kind of inform the surveyor of what
8  he needs to do?
9       A.   No.  All we do is establish their
10  credentials and ability to perform the work that we
11  commission them to do.  And that is before we send
12  them any business to investigate or claims to
13  investigate.  From that point onwards, we expect
14  them to maintain the high standards.
15      Q.   What are those standards?
16      A.   To act professionally.  To deal with
17  issues truthfully.  To do such that is necessary to
18  support their conclusions.
19      Q.   Great Lakes or Concepts Special Risk
20  have that their adjusters or surveyors interview
21  potential witnesses before initiating litigation?
22          MS. GOLDMAN:  Objection.
23          THE WITNESS:  No.  I'm -- they do --
24          they are instructed to investigate the
25          claim and establish the cause of loss and



BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
53–56

Page 53

1    provide a report to us. They should
2    therefore do whatever is necessary for them
3    to do in order to achieve that goal.
4        So again, we would -- the question
5    should be addressed to Revel Boulon. As
6    far as we are concerned, the firm Sedgwick
7    has an eminent representation. Mr. Boulon
8    himself is an eminently qualified
9    individual. So therefore, nobody would
10   know better than him what is required in
11   order to do provide the reports that we
12   have requested.
13   BY MR. VARTAK:
14       Q. Don't you think it's a little
15   important to investigate -- in order to do an
16   investigation to interview the witnesses that saw
17   the incident?
18       MS. GOLDMAN: Objection.
19       THE WITNESS: I would rely entirely on
20   Mr. Boulon to determine what was required.
21   I understand, looking at the claims
22   file, that Mr. Grant did interview one of
23   the crew members that was on board the
24   vessel.
25       And so you know, but at the end of

Page 54

1    day, it's Mr. Boulon's duty to do whatever
2    is necessary for him to do in order to
3    provide us with an accurate report.
4    BY MR. VARTAK:
5        Q. There is no requirement from GLI or
6    Concepts Special Risks that require the adjuster or
7    surveyor to gather documents in preparation of
8    their report?
9        MS. GOLDMAN: Objection.
10       THE WITNESS: It's kind of our
11   (inaudible), in as much we rely entirely on
12   Sedgwick, and Revel Boulon within Sedgwick,
13   he was the individual that was appointed
14   within that firm to do whatever is
15   necessary to ascertain the cause of loss
16   and the circumstances surrounded the
17   incident.
18       It's his responsibility to establish
19   what needs to be done. We don't second
20   guess what he does.
21   BY MR. VARTAK:
22       Q. Did GLI or Concepts Special Risk
23   interview any of the charter guests separately?
24       A. No.
25       Q. Do you know if Revel Boulon

Page 55

1    interviewed any of the charter guests?
2        A. No.
3        Q. Do you know if Michael Grant
4    interviewed any of the charter guests?
5        A. I don't know.
6        Q. Did GLI interview the salvor, Tow
7    Boats USA, before initiating litigation?
8        A. Great Lakes did not interview anyone.
9        Q. Did Concept Special Risks?
10       A. Concept Special Risks did not
11   interview anyone.
12       Q. Well, do you know if Revel Boulon
13   interviewed anyone?
14       A. Ask Mr. Boulon.
15       Q. Did you ask Revel Boulon if he
16   interviewed anybody?
17       A. As I mentioned earlier, I have not
18   discussed this case directly with Mr. Boulon. I'm
19   only looking at the reports that he prepared and
20   forwarded to us.
21       Q. But the answer is "no," you never
22   asked him if he interviewed anyone?
23       A. I didn't ask if he had. There may
24   well be something in the file where he has referred
25   to an interview. I can see if I could locate

Page 56

1    something, but it would take some time.
2        Q. Do you know if Michael Grant
3    interviewed anyone, including Tow Boats USA,
4    Mr. Pack, the crew members; CP Chang or Josh
5    Montpellier?
6        A. I believe Mr. Grant did interview
7    Mr. Montpellier. That name rings a bell.
8        Q. Okay. But you don't know if he
9    interviewed anyone else that I just mentioned?
10       A. No.
11       Q. Do you know if Revel Boulon ever
12   interviewed John Stoddard[phonetic]?
13       A. I don't know who Mr. Boulon
14   interviewed.
15       The only reason I mentioned
16   Montpellier is because that name rings a bell.
17       Q. Okay. Do you know if Michael Grant
18   ever interviewed John Stoddard?
19       A. No.
20       Q. Did GLI ever interview Josh
21   Montpellier?
22       A. I just mentioned earlier; GLI nor
23   Concept Special risks interviewed anyone.
24       Q. Okay. And do you know if Revel Boulon
25   interviewed Craig Koblitz, the mechanic?



Page 57

1       A.  We have no idea.
2           The only person that I vaguely recall
3   the name of was Mr. Montpellier.  I do not know who
4   else he interviewed.
5           Those are questions to be addressed to
6   Mr. Boulon and/or Mr. Grant.
7       Q.  Do you know the yard that the yacht
8   was taken to after the incident on the Miami River?
9       A.  I believe, from memory, it was the
10  Merrill-Stevens Yard.
11      Q.  Okay.  And do you know if Revel Boulon
12  or Michael Grant spoke to any of the staff or
13  employees at Merrill-Stevens?
14      A.  I don't know who Revel Boulon or
15  Michael Grant spoke to, other than vaguely
16  recalling mention of Montpellier.
17      Q.  Okay.  Did Great lakes or Special
18  Risks ever request documents from any of the
19  witnesses mentioned above?
20      A.  No.  Great Lakes never had any direct
21  communication with anybody, other than Mr. Boulon
22  and our attorneys, the Great Lakes attorneys.
23      Q.  You don't think it's important to
24  interview witnesses before writing a report?
25          MS. GOLDMAN:  Objection.

Page 58

1           THE WITNESS:  That's a question to
2   Mr. Boulon as to whether he felt it was
3       necessary to interview witnesses in order
4       to complete his report.
5           We certainly didn't think it was
6       necessary to interview witnesses.  We
7       wouldn't have interviewed them ourselves.
8   BY MR. VARTAK:
9       Q.  And you don't think it's important to
10  request documents from the relevant witnesses and
11  parties before filing a lawsuit?
12          MS. GOLDMAN:  Objection.
13          THE WITNESS:  No.  As far as we are
14      concerned, we rely entirely on the people
15      that we have commissioned to do the report.
16  BY MR. VARTAK:
17      Q.  Is it standard for you to procure any
18  documents, or you don't think it's important to
19  receive those before denying the claim?
20          MS. GOLDMAN:  Objection.
21          THE WITNESS:  Well, it sounded like a
22      very similar question.  Can you repeat it?
23  BY MR. VARTAK:
24      Q.  I said regarding the documents and
25  witnesses, don't you think it's important to

Page 59

1   retrieve those and review them before denying the
2   claim?
3           MS. GOLDMAN:  Objection.
4           THE WITNESS:  That's why we appoint a
5       highly qualified surveyor and adjuster to
6       review all the documents.  Many of the
7       documents would mean nothing to us.  He is
8       the perfect person in the perfect position
9       to enter all the information that he
10      gathered.  We don't do it independently;
11      that's why we commission somebody else to
12      do it.
13  BY MR. VARTAK:
14      Q.  Don't you think the person that you
15  appoint to do this investigation would read
16  documents and interview witnesses in order to come
17  up with their conclusions?
18          MS. GOLDMAN:  Objection.
19          THE WITNESS:  -- Mr. Boulon does in
20      order to come up with his report.  He does,
21      I presume, what is appropriate to provide
22      his report.
23  BY MR. VARTAK:
24      Q.  So you don't really care what
25  Revel Boulon does or, you know, what his

Page 60

1   investigation entails as long as you think he is
2   doing his job?
3           MS. GOLDMAN:  Objection.
4           Argumentative.
5           THE WITNESS:  It's not -- we care
6       about insuring that we appoint responsible,
7       professional, truthful people with a good
8       reputation.  Once that has been
9       ascertained, we rely totally upon them.
10  BY MR. VARTAK:
11      Q.  I'm going to put a document up on the
12  screen and move on to another topic.
13          Okay.  This is Exhibit 5.  Do you see
14  the picture on the screen?  The document?
15      A.  Yes, I do.
16          (Thereupon, the Defendant's Exhibit
17          No. 5 was marked for identification.)
18  BY MR. VARTAK:
19      Q.  Okay.  Have you seen this before?
20      A.  No.
21      Q.  Okay.  Well, I'm going to represent to
22  you that this is the bareboat charter agreement
23  that Mr. Pack uses for all of his charters on the
24  Petrus and it was produced in discovery.
25          See the Bates stamp at the bottom

Page 61

1  here?  It says Pack CYM00501?
2      A.  Yes.
3      Q.  Okay.  Okay.  So -- one second.
4          On the application for the insurance,
5  the insured party is Charter Yachts Miami; is that
6  correct?
7      A.  That's correct.
8      Q.  And the insurance has the word
9  "chartered" in it on the applicant's name, correct?
10     A.  Yes.
11     Q.  And that suggests to you that they are
12  engaged in chartering?
13     A.  Not necessarily.  A lot of people use
14  the word "charter" in their name because they want
15  to claim tax relief, so it doesn't automatically
16  mean because it says charter in their name that
17  they are chartering.
18         But the application form disclosed
19  that it was chartering with a captain.
20     Q.  So I'm going to put back Exhibit 5 on
21  the screen, the bareboat-charter agreement.
22         Do you see that?
23     A.  Yes.
24     Q.  Okay.  So what does "bareboat charter"
25  mean to you?

Page 62

1      A.  It means that the vessel is being
2  chartered without a captain.  Literally charter;
3  you are the charting the vessel as a bareboat.
4      Q.  In that exhibit I just put up on the
5  screen, you saw at the top where it said "Bareboat
6  Charter Agreement"?
7      A.  Yes.
8      Q.  Okay.  Going to go down here.  Okay.
9          So this bareboat charter agreement
10  that was between Mr. Pack and the guests that were
11  on this boat -- on the boat that day of the
12  incident, they were bareboat --
13         MS. GOLDMAN:  Objection, facts not in
14         evidence.
15  BY MR. VARTAK:
16     Q.  Can you read this paragraph right
17  here?
18     A.  Yes, it says, "You, as the primary
19  charterer are required to provide and pay for the
20  captain and crew.  A list of qualified captains is
21  provided below that you may choose from, or you as
22  the primary charterer provide your own qualified
23  captain.  If a captain is provided that is not on
24  the list below, three business days will be
25  required to add the individual to our insurance.

Page 63

1  All captains must have sufficient experience, no
2  DUI, no drug convictions, and no felonies."
3      Q.  This is the agreement between Mr. Pack
4  and the charterer's --
5          MS. GOLDMAN:  Objection.  Facts not in
6          evidence.
7  BY MR. VARTAK:
8      Q.  Can you read Part K can here?
9      A.  Yes.  It says, "Hire a qualified and
10  authorized master captain.  The master shall act as
11  the customer's -- at the customer's direction.
12  Provided however that the master shall not have to
13  carry out any order that jeopardizes the safety of
14  the yacht and those on board.  The charterer shall
15  be responsible for any issues that arise, such as
16  tickets or fees for improper use of the vessel or
17  broken laws during the entirety of the charter."
18     Q.  So based on this agreement, would you
19  agree with me that the charterer, as the customer,
20  has to hire and pay for their own crew and captain
21  for the vessel?
22         MS. GOLDMAN:  Objection.
23  BY MR. VARTAK:
24     Q.  -- or charter on the vessel?
25         MS. GOLDMAN:  Objection.

Page 64

1          THE WITNESS:  Well, the document,
2      which as I say I have not seen before,
3      contradicts the application form which
4      specifically asks the question:  Will the
5      vessel will be charted without the captain?
6      And the answer is no.  Right?
7          So therefore, the vessel only be
8      chartered with the captain.  If you look at
9      the website --
10  BY MR. VARTAK:
11     Q.  You are getting -- sorry, you are
12  getting a little bit ahead --
13         MS. GOLDMAN:  I don't think he
14      finished answering Kavan, you cut him off.
15         THE WITNESS:  I am still answering.
16         So you got the fact that the
17      application form specifically asks:  Will
18      the vessel be chartered without a captain?
19      And the answer was No.  Right?
20         So therefore, it's also a
21      named-operator policy.
22         So therefore, in the event that the
23      insured, that the charterer, was going to
24      appoint their own captain, they would have
25      to be approved as a named operator.



BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
65–68

Page 65

1       Thirdly, if you look at the website,
2    the website of charteryachtsmiami.com, WWW,
3    it says, We provide captain and
4    professional stewards.  It also says,
5    Guests pay for fuel, food, drinks and
6    moorage.
7       They don't pay for the crew; the crew
8    is provided through the charter.  That is a
9    charter.  A captain charter, not a bareboat
10   charter.
11      Because the vessel is not being
12   chartered as a bareboat.
13   BY MR. VARTAK:
14      Q.   That wasn't my question, but okay.
15      Just looking at the document here,
16   which is the agreement between Charter Yachts Miami
17   and the charterers that are on the bareboat charter
18   agreement as you see up top here.  Correct?
19      MS. GOLDMAN:  Objection.  Facts not in
20   evidence.
21      THE WITNESS:  I see what's on the
22   document.
23   BY MR. VARTAK:
24      Q.   Yes.  Okay, good.
25      A.   I don't see --

Page 66

1       Q.   And now on --
2       A.   -- I don't see -- sorry, pardon me,
3    Counselor.
4       I don't see anything that says the
5    yacht name or who the charterers were.  So this
6    is -- you represent this as a standard agreement,
7    but this is not representative of what they were
8    doing.
9       Q.   Okay.  And the agreement says that the
10   charterer has to hire a qualified and authorized
11   master, correct?
12      A.   Absolutely.  That's what the agreement
13   says, but that's not what was happening.
14      Q.   And again the list here that we read
15   before on Page 7, it lists -- well, you know what?
16   Let -- read this first name here.
17      Who is that name?
18      A.   Derek Howland.
19      Q.   Okay.  And then what's this name say
20   here?
21      A.   Greg Pack.
22      Q.   Okay.  And would you agree with me
23   both these names, Derek Howland and Greg Pack, are
24   named operators on the policy in question for this
25   lawsuit?

Page 67

1       A.   Yes.  But they also refer to them as
2    qualified captains.  And now we have determined
3    that neither Mr. Howland nor Mr. Pack held a
4    current license.
5       Q.   Okay.  And this document here says
6    Page 7 of 7 on the bareboat charter agreement,
7    correct?
8       A.   Yes.
9       Q.   So this document is part of Mr. Pack's
10   bareboat charter agreement, correct?
11      MS. GOLDMAN:  Objection.
12      THE WITNESS:  Well, that's what you
13   are representing.
14   BY MR. VARTAK:
15      Q.   His name appears right here, correct?
16      A.   Yes.
17      Q.   Highlighting --
18      A.   Yes.
19      Q.   And the other named operator, Derek
20   Howland, also appears on this list?
21      A.   Yes.
22      Q.   Okay.  I'm going to go to the
23   application that you so much want to talk about.
24      So I'm going to put on the screen,
25   this is going to be Exhibit -- I think we are on 6

Page 68

1    right now?
2       MADAME COURT REPORTER:  Yes, this will
3    be No. 6 that you are entering.
4       MR. VARTAK:  Okay.
5       (Thereupon, the Defendant's Exhibit
6    No. 6 was marked for identification.)
7    BY MR. VARTAK:
8       Q.   Can you see the document on the
9    screen?
10      A.   Yes.
11      Q.   This is the charter application,
12   correct?
13      A.   Yes.
14      Q.   Okay.  And No. 1 here it says, "Is
15   this vessel used for fare-paying passengers"?
16      And it says, "Yes."
17      Do you see that?
18      A.   That's correct.
19      Q.   Okay.  And then No. 2 says, "Is this
20   vessel chartered to others without -- with a
21   captain"?
22      And then circled "Yes."
23      A.   Correct.
24      Q.   And No. 4 says, "Is this vessel
25   chartered to others without a captain (bareboat)"?

ESQUIRE
DEPOSITION SOLUTIONS

Page 69

1          Correct?
2     A.   Yes.
3     Q.   And then it says "No"?
4     A.   Correct.
5     Q.   Okay.  And you are aware that Greg
6  Pack was the named operator?
7     A.   Yes.
8     Q.   And you are also aware that Josh
9  Montpellier is a licensed captain and was aboard
10  the vessel on the day of the incident?
11          I believe he --
12          MS. GOLDMAN:  Objection.
13  BY MR. VARTAK:
14     Q.   Sorry, I didn't catch the answer.
15     A.   I believe he was.
16          As I say, that name was familiar to me
17  because I believe he was interviewed by Mr. Grant.
18  And as far as I'm aware, Mr. Montpellier was a
19  licensed captain.
20     Q.   Okay.  And you are aware that both
21  were aboard the vessel on the day of the incident?
22     A.   I believe so.
23     Q.   And this policy that was given to
24  Charter Yachts Miami, he was a named operator on
25  the policy, correct?

Page 70

1     A.   That's correct.
2     Q.   And so that means if the vessel is to
3  do charters, only people who are on the named
4  operator's list can operate the vessel, correct?
5     A.   That's correct.
6     Q.   And GLI would never allow someone that
7  is not on the named-operator list to operate the
8  vessel, correct?
9     A.   That's correct.
10     Q.   And so if the bareboat charter
11  agreement between the parties of Charter Yachts
12  Miami and bareboat charterers required them to hire
13  an operator to captain the vessel, wouldn't that
14  mean that their requirement from GLI to always have
15  a named operator mean that the only people who
16  could operate the vessel would be the ones on the
17  named-operator list, and therefore wouldn't all
18  applicants have to answer "yes" to Question No. 2?
19          MS. GOLDMAN:  Objection.  Compound
20     question.
21  BY MR. VARTAK:
22     Q.   Okay.  I guess I can break that up.
23          Let's see.
24     A.   We have a procedure in place whereby
25  in the event that an additional operator requires

Page 71

1  approval, then that person can be submitted to us
2  for approval.  There is no charge, but we would
3  endorse the policy to name them as an additional
4  operator.
5     Q.   Right.  So --
6     A.   If this vessel -- sorry.  If the
7  vessel was charted without a captain and the
8  charterer was providing their own captain, then the
9  insured will be obliged to submit details of that
10  replacement captain to us for approval as a named
11  operator.
12          If they did not do that, then that
13  would be a breach of the named-operator warranty.
14     Q.   Okay.  I'm going to put the policy --
15  the application back up.
16          Can you read No. 2 again?
17     A.   It says, "Is this vessel chartered to
18  others with a captain."
19     Q.   Do you see the word "provided"
20  anywhere in that sentence?
21     A.   Do I see the word?
22     Q.   Provided.
23     A.   No.
24     Q.   Okay.  So as you were just saying; if
25  the charterer was to bring their own captain aboard

Page 72

1  the vessel, that means the vessel will be chartered
2  with a captain, correct?
3          MS. GOLDMAN:  Objection.
4          THE WITNESS:  No.  Because the
5     charterer is providing the captain.
6  BY MR. VARTAK:
7     Q.   And the captain is on the vessel?
8          Regardless of --
9     A.   Yes.
10     Q.   -- Miami --
11     A.   Yeah.  The captain would be on the
12  vessel, but he would have to be approved as the
13  named operator.
14     Q.   So he -- so a captain would be on the
15  vessel who would have to be a named operator, which
16  means that the vessel would have a charter that has
17  a captain aboard the vessel, correct?
18     A.   No, because you are not chartering the
19  vessel with a captain; you are chartering the
20  vessel.  And then the charterer is providing the
21  captain.
22     Q.   Yes, but the --
23     A.   -- says, "Will the vessel be chartered
24  without a captain"?  And the answer is "No."  No.
25          Which means that you, as the insured,

Page 73

1  are undertaking that you will always provide the
2  captain.  In the event -- and the captain would be
3  an approved-named operator.
4         And in this instance, if the -- and
5  the charterers have provided their own captain,
6  right?  Then that's why I dare say he says in his
7  agreement he meets a minimum of three days.
8  Whether that is because he realizes that he has to
9  get that captain approved as the named operator or
10 whether it's for his own internal reasons, I don't
11 know.  But he would certainly require prior notice
12 because we would not allow the vessel to go out in
13 the custody of somebody that is not a named
14 operator and approved by us.
15     Q.  At the helm of the vessel?
16     A.  That is the named operator.
17     Q.  That is the named operator, correct.
18 Okay.
19         So the vessel always -- okay, that
20 works.
21         And so if the vessel always has to
22 have a named operator that is in charge of the
23 vessel at all times, then wouldn't that mean you
24 have to answer "yes" to No. 2?
25     A.  I'm trying to understand the question.

Page 74

1         It says, You -- will you charter the
2  vessel without a captain?
3         That is to say, would you charter your
4  vessel without you providing the captain?  That is
5  to say, it's a bareboat.
6         A charterer comes along and says, I
7  want to charter your boat.  I have my own captain.
8  Right?  So then it becomes a bareboat charter.
9  Right?
10         Even in the event that the insured had
11 come to us and asked for somebody to be named as an
12 additional named operator, we would assume it would
13 be one of his member of the crew because the vessel
14 is not being chartered to anybody with a captain.
15 It's -- he's already confirmed that in his
16 application.  Right?
17         Had he said that he does both captain
18 charter and bareboat charter; then we would have
19 written the policy.  But we would have charged an
20 additional premium by virtue of the fact that the
21 vessel was engaged in bareboat charter.  But it
22 wasn't disclosed to us that it was doing bareboat
23 charter.
24         Our assumption was it was a captain
25 charter, that he always provided the captain.

Page 75

1  Sources supported by his website, that they provide
2  the captain.  It's also confirmed on his website
3  that the guests will not have to pay for a captain.
4         But if we provided, inclusive within
5  the charter rebel, in this instance for the vessel
6  Petrus -- that this specifically relates to -- at
7  $5,000 a day.
8     Q.  Would that be permissible to the
9  policy for Charter Yachts Miami to hand over the
10 Petrus to a bareboat charter without insuring that
11 the operator or the charterer used a named
12 operator?
13     A.  It would not be appropriate under the
14 policy wording for him to bareboat charter the boat
15 at all.
16         He has not disclosed that he is going
17 to bareboat the charter of the vessel.  Right?  He
18 is saying that he is going to provide the crew.
19 There is no suggestion in any of his application
20 forms that he is going to bareboat the vessel.
21     MR. VARTAK:  I'm going to pull up the
22 text itself.
23     MADAME COURT REPORTER:  Will that be
24 the next?
25     MR. VARTAK:  The insurance policy.

Page 76

1         (Thereupon, the Defendant's Exhibit
2  No. 7 was marked for identification.)
3  BY MR. VARTAK:
4     Q.  So this is Page 13 of the policy.
5         Can you read part the first sentence
6  here?
7     A.  Yes.  "It is warranted that covered
8  persons must at all times comply with all laws and
9  regulations  governing the use and/or operation of
10 the scheduled vessel."
11     Q.  Okay.  And the Petrus, it was
12 operating within U.S. waters, correct?
13     A.  Yes.
14     Q.  Does GLI and Concept Special Risks
15 regularly insure foreign-built vessels?
16     A.  Foreign build?  Yes.
17     Q.  So it's not just an insurance company
18 for U.S.-flagged boats and vessels, right?
19     A.  No.  Great Lakes is approved in 145
20 countries.
21     Q.  Okay.  And you insure these
22 foreign-build vessels with commercial yacht
23 policies?
24     A.  Yes.
25     Q.  Would GLI offer a policy to insure a



Page 77

1  foreign-built vessel if it was engaged in voyage
2  charters in U.S. waters?
3       A.  Engaged in?
4       Q.  Voyage charters in U.S. waters?
5       A.  Voyage charters?
6       Q.  Yes.
7       A.  Could you explain what you mean by
8  that expression?
9       Q.  Well, I mean, if you don't know what a
10  voyage charter is just say so.
11           MS. GOLDMAN:  He doesn't understand
12      your question.  He is asking you to clarify
13      your question.
14  BY MR. VARTAK:
15       Q.  Okay.  Well, voyage charters are
16  charters from one port in the U.S. to another port
17  in the U.S. for the vessel.
18           But there are, you know, so there are
19  three kinds of charters:  Voyage, time, and
20  bareboat.  I am going to ask you questions about
21  each type, so just answer "yes" or "no."  And if
22  you don't know what I'm talking about, just say "I
23  don't know."  Because that works.
24       A.  I never used the expression "voyage
25  charter" before.  I have captain charter, time

Page 78

1  charter, demise charter, and bareboat charter.
2       Q.  Are you aware that demise charter and
3  bareboat chart are synonyms?
4       A.  Yes.
5       Q.  Okay.  But you don't know what a
6  voyage charter is, correct?
7       A.  I never heard the expression before.
8       Q.  Well, would GLI offer a policy to
9  insure foreign-built vessels if they were engaged
10  in a time charter in U.S. waters?
11       A.  Yes.
12       Q.  And you would offer policies to insure
13  foreign-built vessels if it was engaged in bareboat
14  charters in U.S. waters too, correct?
15       A.  Providing it was disclosed to us and
16  the appropriate premium charged; yes.
17       Q.  Do you know which Coast Guard
18  regulations apply to foreign-built vessels when
19  they want to engage in charter operations in U.S.
20  waters?
21       A.  If it's operating in U.S. waters, I
22  understand that it comes under U.S. Coast Guard
23  regulations.
24       Q.  Okay.  I'm asking:  Do you know which
25  regulations?  Which laws -- which U.S. laws apply?

Page 79

1       A.  I can't cite the -- are you asking me
2  for the reference numbers of the rules?
3       Q.  I mean, the name would work too.
4       A.  It would be U.S. Coast Guard
5  regulations governing the operation of charter
6  vessels.  Depending on the number of passengers and
7  the size of the vessel.
8       Q.  Are you aware that the Petrus is a
9  Leopard-built vessel?
10       A.  Yes.
11       Q.  Do you know where Leopards are built?
12       A.  France, I believe.  I'm trying to
13  remember.  France or Italy.  I'm not sure, I can't
14  recall.
15       Q.  Do you know which Coast Guard
16  regulations would apply to bareboat charters, in
17  general?
18       A.  I don't believe U.S. Coast Guard
19  regulations, beyond safety requirements, apply to
20  bareboat charter.  It's primarily the requirement
21  of a captain, a licensed captain.
22           Depending on the number of passengers,
23  if it's only six passengers maximum; there are
24  different regulations.  If the vessel is under
25  40-foot; there are different regulations.

Page 80

1       Q.  Are you aware that under U.S. law,
2  foreign-built vessels can only be legally bareboat
3  charter?
4           MS. GOLDMAN:  Objection.
5           THE WITNESS:  No.
6  BY MR. VARTAK:
7       Q.  Are you aware that under U.S. Coast
8  Guard law, operators of a bareboat charter don't
9  have to be licensed with the Coast Guard?
10           MS. GOLDMAN:  Objection.
11           THE WITNESS:  I'm aware that
12      bareboat-charter doesn't have the same
13      requirement as captain-charter.
14           And I'm not sure that it would relate
15      to foreign-built vessels.  It might relate
16      to foreign-flag vessels.
17  BY MR. VARTAK:
18       Q.  Are you aware that under the bareboat
19  charter agreements, the charterer -- the bareboat
20  charterer becomes the pro hac vice owner of the
21  vessel for that time essentially?
22       A.  Yes, correct.
23       Q.  And that under bareboat charter
24  agreements, the bareboat charterer has to select
25  and hire and pay their own crew members?



Page 81

1     A.  Unless they are competent to operate
2  the vessels themselves.
3         That's why we charge an additional
4  premium if they are engaged in bareboat charter.
5  Because they are less familiar with the vessel and
6  because they don't necessarily have to be a
7  licensed -- a U.S. Coast Guard or licensed captain.
8     Q.  Are you aware that in this case for
9  the charter that was on the trip during the
10 sinking, that Josh Montpellier, CP Chang and Greg
11 Pack, they were all paid separately by the
12 charterer directly?
13        MS. GOLDMAN:  Objection.
14        THE WITNESS:  No, I'm not aware of
15 that.
16        MR. VARTAK:  I'm going put another
17 picture up, and that should be Exhibit 7.
18        MADAME COURT REPORTER:  No, it will be
19 Exhibit 8.
20        MR. VARTAK:  Eight?  Okay.
21        THE WITNESS:  Uh-huh.
22        (Thereupon, the Defendant's Exhibit
23 No. 8 was marked for identification.)
24 BY MR. VARTAK:
25    Q.  Do you see this picture?

Page 82

1     A.  Yes.
2     Q.  Have you seen this picture before?
3     A.  I don't believe so.
4     Q.  Okay.  This is the Petrus, correct?
5     A.  Yes.
6     Q.  And you can see on the side it says,
7  RMK Merrill-Stevens?
8     A.  That's correct.
9     Q.  Just a second.  Okay, there we go.
10        And at the bottom, you can see it says
11 Pack CYM 00036?  Do you see that in red?
12    A.  Just about, yes.
13    Q.  Okay.  And you can see here, this is
14 the port propeller?
15    A.  Yes.
16    Q.  Okay.  And this is -- in this case
17 here, you see the line that's wrapped around and
18 kind of frayed, and hanging off the middle of the
19 port propeller?
20    A.  Yes.
21    Q.  Okay.  And you are aware of the
22 defendant's position that it was this line that
23 caused the loss and sinking as it was attached to
24 something underwater in the Miami River?
25    A.  Yes.  Which is why we went back to

Page 83

1  Revel Boulon for his further comments.
2     Q.  Okay.  And you stated that
3  Michael Grant was appointed by Revel Boulon and
4  survey the vessel at Merrill-Stevens; is that
5  correct?
6     A.  That's correct.
7     Q.  Do you know what part of the vessel or
8  parts that Michael Grant looked at and, you know,
9  took notes on and surveyed?
10    A.  No, I'm not privy to Mr. Grant's
11 report.
12    Q.  Do you know if Michael Grant ever made
13 any mention of seeing that line at Merrill-Stevens
14 when he was there?
15        MS. GOLDMAN:  Objection.  Asked and
16 answered.
17        He just said he doesn't know.
18 BY MR. VARTAK:
19    Q.  You can still answer.
20    A.  Yeah.  As far I'm concerned, I have
21 not seen Michael Grant's report, I don't know
22 exactly what he saw.  But presumably whatever he
23 saw he reported it to Revel Boulon.
24    Q.  Do you have any policies as to the
25 qualifications of a surveyor that needs to be hired

Page 84

1  by your adjusters and other surveyors?
2         For example, is there anything from,
3  you know, GLI or Concept Special Risks that tells
4  Revel Boulon who he can or cannot hire if he needs
5  extra help?
6     A.  No.  That's Mr. Boulon's call.  And he
7  will only use someone that he has confidence in.
8     Q.  So there is no guidelines or policies
9  that -- or even a list of surveyors that are
10 acceptable to the insurance company?
11    A.  Yes, we do not vet their
12 subcontractors.
13    Q.  Okay.  Do you know if Michael Grant
14 has a maritime background?
15    A.  I have met Michael Grant, I believe he
16 does have a maritime background, but I can't
17 recall.  It was some years ago that I met him.
18    Q.  Doesn't it strike you as a little odd
19 that Michael Grant when he was there at
20 Merrill-Stevens, he didn't think anything of the
21 line that was, you know, attached to the prop, just
22 hanging about?
23        MS. GOLDMAN:  Objection.  Facts not in
24 evidence.
25        THE WITNESS:  As far as I'm concerned,



BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
85–88

Page 85

1    I mean, I'm not privy to what Mr. Grant saw
2    or what Mr. Grant did not see.  I don't
3    know when that photograph was taken.
4    Right?  So I don't know whether that line
5    was wrapped around the propeller at the
6    time that he looked at the vessel.
7        Those questions could be addressed to
8    Mr. Grant or Mr. Boulon.
9    BY MR. VARTAK:
10       Q.   And just to be clear:  Michael Grant
11   was sent by GLI's representative, Revel Boulon, to
12   investigate the sinking?
13       MS. GOLDMAN:  Objection.
14       THE WITNESS:  That's correct.
15   BY MR. VARTAK:
16       Q.   And you don't have any thoughts either
17   way as to the completeness or not completeness of
18   the Michael Grant's investigation?
19       A.   No.  That would be the responsibility
20   of Revel Boulon to determine whether it was
21   complete.
22       Q.   You didn't think it was a little odd
23   that Michael Grant didn't make any notes about
24   the --
25       MS. GOLDMAN:  Objection.

Page 86

1        Kavan, he hasn't seen Grant's report.
2    What is the purpose of this line of
3    questioning?
4    BY MR. VARTAK:
5        Q.   Okay.  Well.  Do you think you should
6    have seen Michael Grant's report?
7        A.   No.  I relied entirely on Revel
8    Boulon.
9        Revel Boulon analyzed Michael Grant's
10   report.  Revel Boulon would have had conversations
11   with Michael Grant.
12       Q.   Doesn't strike you as a little odd
13   that nobody took a sample of the rope that was
14   attached there?
15       MS. GOLDMAN:  Objection.
16       THE WITNESS:  You can address those
17       questions to Mr. Grant and Mr. Boulon.
18       Particularly Mr. Grant.  Right?
19   BY MR. VARTAK:
20       Q.   But --
21       A.   -- established whether Mr. Grant even
22   saw the rope wrapped around the propeller.  Whether
23   the rope was even there at the time he inspected
24   the vessel.
25       I don't know, I didn't see his report.

Page 87

1        Q.   Revel Boulon and Grant are basically
2    your agents, correct?
3        MS. GOLDMAN:  Objection.
4        THE WITNESS:  We commissioned them;
5        they are independent contractors acting on
6        behalf of insurers to investigate the
7        claim.
8    BY MR. VARTAK:
9        Q.   Do you know if Michael Grant ever
10   questioned Josh Montpellier, Mr. Pack, John
11   Stoddard, Tow Boats USA, about anything that
12   happened that day of the incident?
13       MS. GOLDMAN:  Objection.  Asked and
14       answered I don't know how many times
15       already.
16       He has no knowledge of what
17       Michael Grant did.
18       You may answer, Mr. Usher.
19       THE WITNESS:  Well, and quite
20       correctly.
21       As I said before:  I'm not privy to
22       Mr. Grant's report.  I'm only privy to
23       Revel Boulon's report.
24   BY MR. VARTAK:
25       Q.   Did anyone, either Michael Grant,

Page 88

1    Revel Boulon, GLI, or anyone at Concept Special
2    Risks, ever ask Tow Boats USA about the identities
3    of the divers that were under the boat during the
4    rescue operations?
5        A.   Concept Special Risks and Great Lakes
6    made no inquires beyond appointing Revel Boulon.
7    You will have to ask Revel Boulon and/or Michael
8    Grant if he interviewed anybody engaged in the
9    savage operation.
10       (Whereupon, a brief technical
11       pause.)
12   BY MR. VARTAK:
13       Q.   Did Revel Boulon's report ever make
14   any mention about interviewing anybody?
15       A.   I believe one of his reports mentioned
16   an interview between Michael Grant and
17   Mr. Montpellier.
18       Q.   Did Revel Boulon's report ever make
19   any mention about asking the Tow Boat USA salvors
20   about the divers that they sent, if they ever saw
21   any rope underwater?
22       A.   I don't recall him referring to that,
23   no.
24       Q.   Did Revel Boulon's report ever make a
25   mention about questioning John Stoddard and the



Page 89

1  things that he saw that day?
2      A.  I don't recall any reference to that.
3      Q.  Did Revel Boulon ever interview or
4  make any mention about interviewing anyone at Tow
5  Boats USA about the types of lines and ropes that
6  they used to secure their air bags?
7      A.  No, I don't.  You will have to address
8  those questions to Mr. Boulon.  There was nothing
9  in his report that referred to that, that I recall.
10     Q.  Did Revel Boulon or Michael Grant ever
11  make any mention about testing or analyzing the
12  types of ropes and lines that Tow Boats USA used,
13  compared to the line that was attached to the
14  propeller?
15     A.  I don't recall him referring to that,
16  no.
17     Q.  And none of this kind of strikes you
18  as odd that Revel Boulon never mentioned any of
19  these types of investigatory steps?
20     A.  No.  I believe that as far as I'm
21  aware, this theory only became apparent very
22  recently.  With Mr. Maclaren's expert testimony
23  alluding to a rope having ensnared the propeller
24  and dragged the stern of the vessel down.  Which
25  seems an extraordinary unlikely scenario.

Page 90

1          But as you would expect, we went back
2  to the Mr. Boulon for his comments.  Mr. Boulon is
3  equally skeptical.
4      Q.  Did Revel Boulon ever do any
5  independent testing or analysis to, you know,
6  verify or rebut or question this theory?
7      A.  I'm sure he did when he was confronted
8  with the expert testimony.  But you should address
9  those questions to Mr. Boulon.
10     Q.  Would you agree with me that something
11  outside of the vessel, presumably an object
12  underwater that pulled down the stern when it gets
13  caught on the propeller, would be an external event
14  and thus covered under the policy?
15         MS. GOLDMAN:  Objection.
16         THE WITNESS:  If it could be -- if it
17         could be evidence that that was the cause
18         of the stern of the vessel being submerged
19         and the ingress of water; then yes, there
20         would be coverage because it would be an
21         external event.
22         But at the moment, there is nothing
23         really to support that.
24  BY MR. VARTAK:
25     Q.  Is a line attached to a heavy,

Page 91

1  underwater object, would also be an external event
2  if it gets caught up on the propeller?
3      A.  It would --
4          MS. GOLDMAN:  Objection.
5          THE WITNESS:  It would have had to
6          have been a very heavy object to draw the
7          stern down on a vessel of this size.  The
8          rope itself would not do it.
9      Q.  Okay.  And putting aside the issue of
10  the line on the propeller; if the court finds in
11  the factual matter that water did enter the vessel
12  through the swim ladder compartment, would you read
13  that also to be an external cause of the loss?
14         MS. GOLDMAN:  Objection.
15         THE WITNESS:  It depends entirely on
16         why the water came in through the stern
17         compartment.
18         If it came through because of an
19         external event, i.e., snagging a rope that
20         was anchored to something that was powerful
21         or heavy enough, immovable enough, to drag
22         the vessel down, then that would be an
23         external event.
24         If however the water ingress was
25         caused because the vessel simply was not

Page 92

1          watertight, then that would not be an
2          external event.
3  BY MR. VARTAK:
4      Q.  Do you know how old the Petrus is?
5      A.  It was built in 1999.
6      Q.  And have you heard of any other
7  instances of the Petrus taking on water and sinking
8  through the water coming through the swim platform
9  ladder?
10     A.  Nothing --
11         MS. GOLDMAN:  Objection.
12         THE WITNESS:  Nothing has been
13         disclosed to us referring to an earlier
14         instance involving the vessel taking on
15         water.
16  BY MR. VARTAK:
17     Q.  Have you heard of other Petrus --
18  sorry.  Leopard vessels like the Petrus taking on
19  water through the swim platform ladder?  Just as a
20  regular occurrence?
21     A.  No.
22     Q.  And you would agree that it is
23  acceptable for vessels to have all sorts of holes
24  and different compartments connecting to each
25  other, as long as they are all above the water



BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
93—96

Page 93

1 line?

2      A.  Above the water line and watertight.

3      Q.  Well, you can't have a watertight --

4 water compartment, right?

5      (Unknown party speaking.)

6      THE WITNESS:  Sorry, what happened

7   there?  Something went wrong with --

8      MADAME COURT REPORTER:  You will have

9   to repeat that question.

10     MS. GOLDMAN:  I apologize, someone

11   came in my office.

12 BY MR. VARTAK:

13     Q.  So I was asking:  So a vessel

14 compartment can't be watertight if it has holes and

15 stuff that connect to other compartments, correct?

16     A.  They still have to be watertight as

17 far as I'm concerned.  I mean, if the vessel has

18 got a hole in it; then it's not watertight even if

19 it's above the water.  If it is at times below the

20 waterline when the vessel is underway; it has to be

21 watertight.

22     Q.  Right.  But if it's above the

23 waterline at all times during normal operations,

24 then that's reasonable and acceptable?

25     A.  Yes.  I mean as far as I'm concerned,

Page 94

1 I mean, the -- the door to the controls and, you

2 know, the cabin of the vessel doesn't have to be

3 watertight, it must have reasonable seals on it.

4      But, yeah.  If it's something that

5 would never be submerged underwater under normal

6 circumstances, then no, it doesn't have to be

7 watertight.

8      Q.  Okay.  And you agree with me that if

9 the port engine unexpectedly shut off because of an

10 external event, that would potentially be because

11 of a line wrapped around the propeller?

12     MS. GOLDMAN:  Objection.

13     THE WITNESS:  The theory has been put

14     forward by Neil Maclaren; it has been

15     rebutted by Revel Boulon.

16 BY MR. VARTAK:

17     Q.  But the line as an external event

18 could have potentially caused the port engine to

19 shut off after it choked the propeller?

20     MS. GOLDMAN:  Objection.

21     THE WITNESS:  In the event that the

22     line got snagged onto the propeller and it

23     was anchored to something that would drag

24     the vessel's stern down, then that would be

25     an external event.  Right?

Page 95

1      It seems, in Mr. Boulon's opinion,

2   incredible that that would have happened.

3      So we are relying on our expert's

4   testimony, right?  And that's all I have to

5   go on, is our expert's testimony.

6      When we received this theory of how

7   the loss could have occurred from the

8   expert that you put forward

9 Mr. Neil Maclaren, we immediately went to

10   Revel Boulon to ask him what his opinion

11   was of this theory.  He did not have a very

12   high opinion of that theory.

13     Q.  Okay.  And do you know who John

14 Stoddard is?

15     A.  No.

16     Q.  You never heard that name before?

17     A.  Only when you mentioned it earlier.

18     Q.  Okay.  And are you also aware that the

19 port skeg had damage underneath it?

20     MS. GOLDMAN:  Objection.

21     THE WITNESS:  I'm not privy to the

22     individual field survey reports.

23     If it's not mentioned in Revel Boulon

24     survey report -- survey report, I'm not

25     aware of it.

Page 96

1 BY MR. VARTAK:

2      Q.  So you are not aware that the vessel

3 had gouge marks running underneath?

4      MS. GOLDMAN:  Objection.

5      THE WITNESS:  No.  I mean, again,

6     address those questions to Mr. Boulon

7     and/or Mr. Grant.

8      My understanding is that the survey

9     conducted by Mr. Maclaren was not done

10     until August 9, 2021.  I have no idea what

11     the conditions of the vessel was

12     immediately following the incident.

13     Mr. Grant will be aware of that.  Mr. Grant

14     have a file with photographs and his own

15     observations.  So address those questions

16     to Mr. Grant or Mr. Boulon.

17 BY MR. VARTAK:

18     Q.  And you are not aware that the port

19 propeller was also damaged?

20     MS. GOLDMAN:  Objection.

21     THE WITNESS:  No, I'm not aware of the

22     contents of the field survey.  I'm only

23     aware of the conclusions of Mr. Boulon.

24 BY MR. VARTAK:

25     Q.  Okay.  And are you aware that



BERIC A. USHER
GREAT LAKES INS. vs CHARTERED YACHTS

March 10, 2022
97–100

Page 97

1  Michael Grant never looked to that damage on the
2  bottom of vessel until Greg Pack personally had
3  pointed it out to Mr. Grant at Merrill-Stevens?
4       MS. GOLDMAN:  Objection.
5       THE WITNESS:  Again, I'm not aware of
6  what -- of what Mr. Grant did or what
7  conversations Mr. Grant had, who Mr. Grant
8  interviewed, what Mr. Grant inspected.
9       I'm not privy to his report.
10      MR. VARTAK:  Can we take a quick
11  10-minute break?
12      (Whereupon, a break was taken.)
13      MR. VARTAK:  That's all the questions
14  that I have for you today.
15      MS. GOLDMAN:  In that case, nothing
16  from me.
17      THE WITNESS:  I waive.
18      MS. GOLDMAN:  We would like a copy,
19  please.
20      MR. VARTAK:  We will order a copy as
21  well.
22      (Thereupon, it was agreed by and
23  between counsel and the witness that the
24  reading, examination and signing of the
25  deposition were waived.)

Page 98

1       (Thereupon, the deposition was
2  concluded at 11:40  a.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1          CERTIFICATE OF SHORTHAND REPORTER
2
   STATE OF FLORIDA  )
3                    )  SS.
   COUNTY OF DADE    )
4
5       I, the undersigned authority hereby
   certify that the foregoing transcript, pages 1
6  through 98 are a true and correct transcription of
   the deposition of Beric Usher, taken before me at
   the time and place stated in the caption hereof.
7
        I further certify that the said
8  witness was duly sworn according to law.
9       I further certify that I am not of
   counsel to either of the parties to said cause or
10 otherwise interested in the event thereof.
11      IN WITNESS WHEREOF, I hereunto set my
   hand and affix my official seal of office this 22
12 day of March 2022.
13
14
15 MARVALENCIA MILLER
   Notary Public in and for the State of Florida
16 My Commission No. GG148575
   Expires:  August 6, 2022
17
18
19
20
21
22
23
24
25

Page 100

1          CERTIFICATE OF OATH
2
3  STATE OF FLORIDA
4  COUNTY OF DADE
5
6
7       I, the undersigned authority, certify
8  that Beric Usher personally appeared before me and
9  was duly sworn.
10      WITNESS my hand and official seal this
11 22 day of March, 2022.
12
13
14
15 _ _ _ _ _ _ _ _ _ _ _ _ _
16
17 MARVALENCIA MILLER
18
19 Notary Public State of Florida
20 My commission Expires:  8-6-22
21
22
23
24
25

